UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO.: 3:04 CV 338-H

JAMES H. O'BRYAN, DONALD E. POPPE, and
MICHAEL J. TURNER, Individually and on Behalf
of All Similarly Situated Persons                                               PLAINTIFFS


vs.


HOLY SEE, in its Capacity as a Foreign State
(State of the Vatican City), and in its Capacity
as an Unincorporated Association and Head
of an International Religious Organization                                       DEFENDANT


**DEFENDANT HOLY SEE'S MEMORANDUM IN SUPPORT OF
SECOND MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.      INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.    LEGAL STANDARD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        A.      FSIA Jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        B.      Factual Motion to Dismiss for Lack of Subject Matter Jurisdiction. . . . . . . . . . . 4

        C.      The Parties' Burdens. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

IV.     RELEVANT PROCEDURAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . 5

V.      RELEVANT FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        A.      The Relationship Between the Holy See and the Archbishop of Louisville. . . . . . 7

        B.      Facts Relating to the Priests Who Abused Plaintiffs. . . . . . . . . . . . . . . . . . . 8

                1.      Louis Miller. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

                2.      Arthur Wood. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

                3.      Lawrence Kuntz. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        C.      *Crimen sollicitationis* and Plaintiffs' Claims. . . . . . . . . . . . . . . . . . . . . . . . 13

VI.     ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        A.      The Tort Exception's Discretionary Function Exclusion Bars
                Plaintiffs' Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        B.      The Archbishop of Louisville Did Not Commit Any Tortious Acts
                or Omissions Injuring Plaintiffs O'Bryan and Poppe. . . . . . . . . . . . . . . . . . 20

        C.      Because the Archbishop of Louisville was Not an Employee of the
                Holy See, this Court Lacks Subject Matter Jurisdiction Over All of
                Plaintiffs' Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

                1.      The Court Should Apply General Common Law Principles
                        to Determine Whether the Archbishop is a Holy See Employee. . . . . . . 22

                2.      The Common Law Employment Test. . . . . . . . . . . . . . . . . . . . . . . 24

                3.      None of the Common Law Employment Factors is Met. . . . . . . . . . . . 25

                        a.      The Archbishop of Louisville was Not Acting on
                                the Holy See's Behalf and was Not Employed in the
                                Holy See's Affairs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

                        b.      The Holy See Did Not Have the Requisite Control or
                                Right to Control. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

|  | i. | The Holy See Did Not Have the Requisite Day-to-Day Operational Control. | 27 |

|  | ii. | Employment Cannot be Based Upon the Religious Control Allegations in the Complaint. | 31 |

| c. | | The Holy See Does Not Pay the Archbishop's Compensation. | 35 |

| d. | | The Holy See Does Not Provide the Archbishop with Employee Benefits. | 35 |

| e. | | The Archbishop is Not Treated as the Holy See's Employee for Tax Purposes. | 36 |

| f. | | The Holy See and the Archbishop of Louisville are Engaged in Distinct Occupations. | 36 |

| g. | | The Archbishop's Work Requires a High Degree of Skill. | 37 |

| h. | | The Holy See Does Not Provide the Archbishop with Equipment or Instrumentalities for His Work. | 37 |

| i. | | The Archbishop Does Not Work on Holy See Premises. | 37 |

| j. | | The Archbishop Decides When and How Long to Work. | 37 |

| k. | | The Local Custom Weighs Against Employment. | 37 |

| l. | | The Duration of the Archbishop's Tenure Weighs Against Employment. | 38 |

| m. | | The Archbishop Hires and Pays His Own Employees. | 38 |

| n. | | The Running of the Archdiocese of Louisville is Not Part of the "Regular Business" of the Holy See. | 38 |

| o. | | The Holy See is Not "In Business". | 39 |

| p. | | The Holy See and the Archbishop Do Not Believe They Have an Employment Relationship. | 39 |

VII.   CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

# TABLE OF AUTHORITIES

## CASES

*Alford v. United States*,
116 F.3d 334 (8th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Am. Telecom Co. v. Republic of Lebanon*,
501 F.3d 534 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4,5 n.6

*Arlinghaus v. Gallenstein*,
115 S.W.3d 351 (Ky. App. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Arriba Ltd. v. Petroleos Mexicanos*,
962 F.2d 528 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5,28 n.34

*Asher v. Rack Conveyor Installation, Inc.*,
Nos. 09-5182, 09-5183, 2010 WL 1741092 (6th Cir. May 3, 2010) . . . . . . . . . . . . . 26,29

*Asociacion de Reclamantes v. United Mexican States*,
735 F.2d 1517 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Autery v. United States*,
424 F.3d 944 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Aymes v. Bonelli*,
980 F.2d 857 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36,39

*Berkman v. United States*,
957 F.2d 108 (4th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28 n.35

*Booker v. GTE.net LLC*,
350 F.3d 515 (6th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Brandes v. United States*,
783 F.2d 895 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Brooks v. S.W. Transp. Co.*,
494 F.2d 1271 (6th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Brown v. CSX Trans., Inc.*,
13 S.W.3d 631 (Ky. App. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Brucker v. United States*,
338 F.2d 427 (9th Cir. 1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Bryson v. Middlefield Vol. Fire Dep't.*,
No. 1:07CV724, 2009 WL 5030799 (N.D. Ohio Dec. 14, 2009) . . . . . . . . . . . . . . . . . 35

*Burkhart v. Wash. Metro. Area Transit Auth.*,
112 F.3d 1207 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6,19

*Byars v. Bluff City News Co.*,
609 F.2d 843 (6th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*California v. Arizona*,
440 U.S. 59 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Campanella v. Commerce Exch. Bank*,
    137 F.3d 885 (6th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Campbell v. BNSF Ry. Co.*,
    600 F.3d 667 (6th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28,30

*Carlyle v. Dep't of Army*,
    674 F.2d 554 (6th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6,19

*Carnes v. Dep't of Econ. Sec.*,
    435 S.W.2d 758 (Ky. 1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Chambers v. Wooten's IGA Foodliner*,
    436 S.W.2d 265 (Ky. 1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater*,
    2 F.3d 1514 (11th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31 n.38

*Clackamas Gastroent. Assoc. v. Wells*,
    538 U.S. 440 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Cmty. for Creative Non-Violence v. Reid*,
    490 U.S. 730 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24,25,36,37

*Corbin Fruit Co. v. Decker*,
    68 S.W.2d 434 (Ky. App. 1934). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Crete v. City of Lowell*,
    418 F.3d 54 (1st Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Crunk v. Dean Milk Co.*,
    No. 3:06CV-609-DW, 2008 WL 2473662 (W.D. Ky. June 17, 2008). . . . . . . . . . . . . . 35

*Dale v. Colagiovanni*,
    443 F.3d 425 (5th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Davis v. McCourt*,
    226 F.3d 506 (6th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19 n.23

*Doe v. Holy See*,
    557 F.3d 1066 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19,20,27

*Drevlow v. Lutheran Church*,
    991 F.2d 468 (8th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34 n.42

*Duty v. Dep't. of Interior*,
    735 F.2d 1012 (6th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*EEOC v. Catholic Univ. of Am.*,
    83 F.3d 455 (D.C. Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Eyerman v. Mary Kay Cosmetics, Inc.*,
    967 F.2d 213 (6th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Fagot Rodriguez v. Republic of Costa Rica*,
    139 F. Supp. 2d 173 (D.P.R. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19 n.24

*Farlow v. Wachovia Bank,*
    259 F.3d 309 (4th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*FedEx Home Delivery v. NLRB,*
    563 F.3d 492 (D.C. Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba ("Bancec"),*
    462 U.S. 611 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22,23,24

*Fisher v. United States,*
    356 F.2d 706 (6th Cir. 1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Folwell v. Bernard,*
    477 So.2d 1060 (Fla. App. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Foremost-McKesson, Inc. v. Islamic Republic of Iran,*
    905 F.2d 438 (D.C. Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Frito-Lay, Inc. v. NLRB,*
    385 F.2d 180 (7th Cir. 1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Gentek Bldg. Prod., Inc. v. Steel Peel Litig. Trust,*
    491 F.3d 320 (6th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4,5

*Gibson v. United States,*
    567 F.2d 1237 (3d Cir. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Gould, Inc. v. Pechiney Ugine Kuhlmann,*
    853 F.2d 445 (6th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Graves v. Women's Prof. Rodeo Ass'n,*
    907 F.2d 71 (8th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Gregory v. Ashcroft,*
    501 U.S. 452 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3 n.4

*Haven v. Polska,*
    215 F.3d 727 (7th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Hilton Int'l Co. v. NLRB,*
    690 F.2d 318 (2d Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Hi-Tech Video Prod., Inc. v. Capital Cities/ABC, Inc.,*
    58 F.3d 1093 (6th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35,36,39

*Hutchison v. Thomas,*
    789 F.2d 392 (6th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*In re Air Crash at Lexington,*
    No. 5:06-CV-316-KSF, 2008 WL 2945944 (E.D. Ky. July 8, 2008). . . . . . . . . . . 28,30,36

*Jennings v. United States,*
    530 F. Supp. 40 (D.D.C. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Johnson v. Louisville & N.R. Co.,*
    394 S.W.2d 110 (Ky. 1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Jones v. Wolf,*
    443 U.S. 595 (1979).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31 n.38

*Kedroff v. St. Nicholas Cathedral,*
    344 U.S. 94 (1952).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Kelley v. S. Pac. Co.,*
    419 U.S. 318 (1974).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26,30,36

*Ky. Unemp't Ins. Comm'n v. Landmark Cmty. Newspapers,*
    91 S.W.3d 575 (Ky. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24,25

*Kippen v. Jewkes,*
    258 F.2d 869 (10th Cir. 1958). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Kreshik v. St. Nicholas Cathedral,*
    363 U.S. 190 (1960).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33 n.41

*Kropp v. Douglas Aircraft Co.,*
    329 F. Supp. 447 (E.D.N.Y. 1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Lanigan Storage & Van Co. v. United States,*
    389 F.2d 337 (6th Cir. 1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36,37

*Latsko v. Nat'l Carloading Corp.,*
    192 F.2d 905 (6th Cir. 1951). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Lerohl v. Friends of Minn. Sinfonia,*
    322 F.3d 486 (8th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Letnes v. United States,*
    820 F.2d 1517 (9th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Lewis v. United States,*
    680 F.2d 1239 (9th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Lipka v. United States,*
    369 F.2d 288 (2d Cir. 1966).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Local 777 v. NLRB,*
    603 F.2d 862 (D.C. Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Logue v. United States,*
    412 U.S. 521 (1973).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Long v. The Tampico & Progresso,*
    16 F. 491 (S.D.N.Y. 1883).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24 n.29

*Lorillard v. Pons,*
    434 U.S. 575 (1978).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Lutz v. St. Paul Fire & Marine Ins. Co.,*
    No. 1:03-CV-750, 2005 WL 2372871 (S.D. Ohio Sept. 26, 2005). . . . . . . . . . . . . . . . . . 30

*MacArthur Area Citizens Ass'n v. Republic of Peru,*
    809 F.2d 918 (D.C. Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Mason & Hoge Co. v. Highland*,
  116 S.W. 320 (Ky. App. 1909). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*McDonald's Corp. v. Ogborn*,
  — S.W.3d —,  2009 WL 3877533 (Ky. App. Nov. 20, 2009). . . . . . . . . . . . . . . . . . . . 20

*Metcalf & Eddy v. Mitchell*,
  269 U.S. 514 (1926). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Metrop. Pilots Ass'n v. Schlosberg*,
  151 F. Supp. 2d 511 (D.N.J. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Middleton v. Hacker*,
  No. 2006-CA-002364-MR, 2007 WL 3122270 (Ky. App. Oct. 26, 2007). . . . . . . . . . . 38

*Minker v. United Methodist Church*,
  894 F.2d 1354 (D.C. Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34 n.42

*Nair v. Oakland County Cmty. Mental Health Auth.*,
  443 F.3d 469 (6th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2 n.2

*Nationwide Mut. Ins. Co. v. Darden*,
  503 U.S. 318 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*New Ind. Tobacco Warehouse v. Latham*,
  282 S.W.2d 846 (Ky. 1955). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*N. Am. Van Lines, Inc. v. NLRB*,
  869 F.2d 596 (D.C. Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Norton v. Murphy*,
  661 F.2d 882 (10th Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Nurse v. United States*,
  226 F.3d 996 (9th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*O'Bryan v. Holy See*,
  556 F.3d 361 (6th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . 2,3,4,5,6,19,20,21,22,25 n.31

*O'Connor v. Davis*,
  126 F.3d 112 (2d Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Papa John's Int'l, Inc. v. McCoy*,
  244 S.W.3d 44 (Ky. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22 n.27,25 n.31,28,30

*Phelps v. Louisville Water Co.*,
  103 S.W.3d 46 (Ky. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Randolph v. Budget Rent-A-Car*,
  97 F.3d 319 (9th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22 n.27

*Republic of Philippines v. Pimentel*,
  128 S. Ct. 2180 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23 n.29

*Robinson v. Gov't of Malaysia*,
  269 F.3d 133 (2d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,20

*Saiki v. United States*,
    306 F.2d 642 (8th Cir. 1962). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Sanders v. Casa View Baptist Church*,
    134 F.3d 331 (5th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Schultz v. Gen. R.V. Ctr.*,
    512 F.3d 754 (6th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Serbian E. Orthodox Diocese v. Milivojevich*,
    426 U.S. 696 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Shah v. Deaconess Hosp.*,
    355 F.3d 496 (6th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Shephard Elevator Co. v. Thomas*,
    300 S.W.2d 782 (Ky. 1957). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Silviotti v. Morning Call, Inc.*,
    No. CIV.A. 01-4692, 2002 WL 31859429 (E.D. Penn. Dec. 12, 2002). . . . . . . . . . . . . 35

*Speen v. Crown Clothing Corp.*,
    102 F.3d 625 (1st Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Standard Oil Co. v. Anderson*,
    212 U.S. 215 (1909). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Steel Co. v. Citizens for Better Env't*,
    523 U.S. 83 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2 n.2

*Steilberg v. C2 Facility Solutions, LLC*,
    275 S.W.3d 732 (Ky. App. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22 n.27,37

*Stena Rederi AB v. Comision de Contratos*,
    923 F.2d 380 (5th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*,
    552 U.S. 148 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Sullivan v. Gen. Elec. Co.*,
    226 F.2d 290 (6th Cir. 1955). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Tercero v. Roman Catholic Diocese of Norwich*,
    48 P.3d 50 (N.M. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Transamerica Leasing, Inc. v. La Republica de Venezuela*,
    200 F.3d 843 (D.C. Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Tsosie v. United States*,
    452 F.3d 1161 (10th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28 n.35

*Uninsured Employers' Fund v. Reliance Nat'l Indemnity Co.*,
    No. 2000-CA-002528-WC, 2003 WL 21826999 (Ky. App. Aug. 8, 2003). . . . . . . . . . 28

*United Engineers & Constructors, Inc. v. Branham*,
    550 S.W.2d 540 (Ky. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Gaubert*,
    499 U.S. 315 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20 n.25

*United States v. Hatter*,
    532 U.S. 557 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Lamont*,
    330 F.3d 1249 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*United States v. Orleans*,
    425 U.S. 807 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Vencedora Oceanica Navigacion, S.A. v. Compagnie Nationale Algerienne de Navigation*,
    730 F.2d 195 (5th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19 n.23

*Verlinden B.V. v. Cent. Bank of Nig.*,
    461 U.S. 480 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,23,24

*Watson v. Jones*,
    80 U.S. 679 (1871). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Weary v. Cochran*,
    377 F.3d 522 (6th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29,37

*Wolcott v. Nationwide Mut. Ins. Co.*,
    884 F.2d 245 (6th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36,38

*Zetter v. Griffith Aviation, Inc.*,
    No. 6: 03-218-DCR, 2006 WL 1117678 (E.D. Ky. Apr. 25, 2006). . . . . . . . . . . . . . . . . 25

## STATUTES AND RULES

28 U.S.C. § 1346(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

28 U.S.C. § 1605(a)(5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-3,20,22

28 U.S.C. § 1606 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

FED. R. CIV. P. 12(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FED. R. CIV. P. 12(h)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## OTHER AUTHORITIES

H.R. REP. NO. 245 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

H.R. REP. NO. 94-1487 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23 n.28

REST. 2D AGENCY § 2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

REST. 2D AGENCY § 220(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28 n.35

REST. 2D AGENCY § 220(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

REST. 2D AGENCY § 220(2)(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28 n.35

REST. 2D AGENCY § 220, cmt. h. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

REST. 2D AGENCY § 220, cmt. i. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

REST. 3D AGENCY § 7.07 cmt. f. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25 n.31

*Convenzione di sicurezza sociale tra la Santa Sede e*
  *la Repubblica Italiana* (Jan. 1, 2004).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Fondo Assistenza Sanitaria Statuto e Regolamento* (Jan. 1, 1995)
  (Prot. N. 359.032/G.N.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Pastor Bonus*, 80 *AAS* 841 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3 n.4

*Regolamento Generale della Curia Romana*,
  March 20, 1968, *in* 60 *AAS* 129 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . 4 n.4, 40 n.45

Belman, *New Departures in the Law of Sovereign Immunity*,
  63 AM. SOC'Y INT'L L. PROC. 182 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23 n.28

George Kahale, III & Matias A. Vega, *Immunity and Jurisdiction: Toward a*
  *Uniform Body of Law in Actions Against Foreign States*,
  18 COLUM. J. TRANSNAT'L L. 211 (1979-80). . . . . . . . . . . . . . . . . . . . . . . . . . . . 23 n.28

Niccolò Del Re,
  LA CURIA ROMANA: LINEAMENTI STORICO-GIURIDICI (4th ed. 1998). . . . . . . . . . . . . . . . 40

Von Mehren, *The Foreign Sovereign Immunities Act of 1976*,
  17 COLUM. J. TRANSNAT'L L. 33 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23 n.28

## I.       INTRODUCTION

Following the Holy See's facial motion to dismiss for lack of subject matter jurisdiction, only a single basis for jurisdiction remains.  That basis survived because Rule 8(a) permitted Plaintiffs to proceed based upon the broad allegations in the Complaint.  When the actual facts underlying the sole remaining jurisdictional theory are examined, Plaintiffs' lawsuit collapses under its own weight. After six years of litigation, it is time to put this case to rest.

## II.      SUMMARY OF ARGUMENT

This motion constitutes a factual challenge to this Court's subject matter jurisdiction pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(h)(3).

Plaintiffs have long claimed that their suit is based on *Crimen sollicitationis* ("*Crimen*"). According to Plaintiffs, *Crimen* mandated non-reporting of child abuse in the Archdiocese of Louisville.  Based upon Plaintiffs' assertion, the Sixth Circuit held that the FSIA tort exception's discretionary function exclusion did not apply, since *Crimen* – as alleged – set forth a "mandatory" (*i.e.*, non-discretionary) policy of concealment.

There are two problems with Plaintiffs' *Crimen* theory.  First, as conceded by Plaintiffs' expert, there is no evidence that the *Crimen* procedure was used with regard to any of the three priests at issue here.  In fact, as set forth below, documents from the Archdiocese and O'Bryan's own testimony directly contradict Plaintiffs' *Crimen* theory.  Second, and as Plaintiffs' expert also acknowledges, *Crimen* did not mandate non-reporting of child abuse.  Instead, a bishop following *Crimen* was free to comply with any applicable civil reporting requirements.

Because *Crimen* neither had any connection to Plaintiffs' injuries nor mandated non-disclosure of child abuse allegations, the discretionary function exclusion bars Plaintiffs' suit.

There are other fatal flaws with Plaintiffs' theory of subject matter jurisdiction.  The Sixth Circuit allowed only Plaintiffs' vicarious liability claims to survive the Holy See's initial attack. Under the tort exception, Plaintiffs must show an injury caused by the tortious act or omission of a

Holy See employee. However, with regard to O'Bryan and Poppe,[1] there is no evidence that the Archbishop of Louisville – the supposed Holy See "employee" – had prior knowledge that the priests at issue posed a danger, a prerequisite for finding tortious conduct under Kentucky law.

More fundamentally, Plaintiffs' claims rest on the notion that the Archbishop is a Holy See employee. Employment is easy to plead. However, on a factual attack, the presumptive truthfulness of the Complaint's allegations falls away. When examined as a matter of fact, it is beyond cavil that the Archbishop is not a Holy See employee. The Holy See in no sense exercised the requisite operational day-to-day control over the Archbishop, including the Archbishop's supervision of the priests at issue. In addition, the evidence shows that *none* of the fourteen other employment factors is met. Absent the requisite employment relationship, jurisdiction does not lie.

## III.   LEGAL STANDARD

### A.   FSIA Jurisdiction

The FSIA "must be applied by the District Courts in every action against a foreign sovereign, since subject matter jurisdiction in any such action depends on the existence of one of the specified exceptions to foreign sovereign immunity." *Verlinden B.V. v. Cent. Bank of Nig.*, 461 U.S. 480, 493 (1983).[2] Under the prior decisions of the Court and the Sixth Circuit, only the FSIA's tort exception applies in this case. *See* Memorandum Opinion, DN 82 ("Mem. Op."), at 4-6; *O'Bryan v. Holy See*, 556 F.3d 361, 378-80 (6th Cir. 2009). The tort exception provides:

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case– . . .

---

[1] Plaintiffs' counsel already concede that Turner's lawsuit cannot proceed. *See* Def. Holy See's Memo. in Supp. of Mtn. to Dismiss for Failure to State a Claim upon Which Relief Can Be Granted ("HS Rule 12(b)(6) Memo."), at 10.

[2] Given that the Holy See's Rule 12(b)(6) challenge is purely legal, the Holy See respectfully requests that it be resolved first. While generally a court must resolve subject matter jurisdiction first, *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 94 (1998), the Sixth Circuit has repeatedly recognized that immunity provides an exception to the general rule. *Nair v. Oakland County Cmty. Mental Health Auth.*, 443 F.3d 469, 477 (6th Cir. 2006). Where, as here, the sovereign does not request that the immunity determination be made first, the Sixth Circuit has concluded "that the federal courts have discretion to address the sovereign-immunity defense and the merits in whichever order they prefer." *Id.* at 477.

(5) not otherwise encompassed in paragraph (2) above, in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph shall not apply to –

(A) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused, or

(B) any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights . . . .

28 U.S.C. § 1605(a)(5).[3]

Both this Court and the Sixth Circuit held that Plaintiffs are barred from pursuing a direct theory of liability against the Holy See.  *See*, *e.g.*, *O'Bryan*, 556 F.3d at 386; *see also* Mem. Op. at 8.  As a result, jurisdiction under the tort exception can lie *only* if Plaintiffs were injured by the *non-discretionary* and *tortious* act or omission of a Holy See *employee* in the United States.  28 U.S.C. § 1605(a)(5); *Robinson v. Gov't of Malaysia*, 269 F.3d 133, 140 (2d Cir. 2001).[4]

---

[3]  Emphasis is added, and citations and internal quotations are omitted, throughout this brief, except as otherwise indicated.

[4]  The Complaint – which Plaintiffs have not amended despite numerous opportunities to do so (*cf.* DN 138, at 17 n.13) – never alleges that bishops in the United States are Holy See "officials." *See* Cmplt. ¶¶ 5, 28-29, 38, 43, 47-48, 52-55, 57-62, 65-66, 69, 71(b), 75-77, 80(a), 82, 85, 88, 92, 94, 96-99, 101, 104(b), 108-10, 115, 118, 121 (referring to acts by the Holy See's purported "agents," "employees," "servants," "agencies" or "instrumentalities," but not "officials"). This Court examined whether the allegations were sufficient to show that bishops were Holy See "employees," not "officials." Mem. Op. at 9-11. The Sixth Circuit, in turn, squarely held that "for the conduct of bishops and archbishops and other Holy See personnel to serve as a basis for jurisdiction, these bishops, archbishops and Holy See personnel *must have been* *underlined*employees*underlined* of the Holy See." *O'Bryan*, 556 F.3d at 386; *see also id.* at 382-83. The Sixth Circuit denied Plaintiffs' petition to amend the appellate opinion to include the term "official." *See* Declaration of Jeffrey S. Lena in Support of Def. Holy See's Second Motion to Dismiss for Lack of Subject Matter Jurisdiction ("Lena Decl."), Exhs. A-B.

In light of the Sixth Circuit's opinion and the denial of Plaintiffs' petition for rehearing, the Holy See will not address the "official" issue herein. However, it is worth noting that the issue is governed by the law of the sovereign, *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991), and that a diocesan bishop is not an "official" of the Holy See under Holy See law. *See*, *e.g.*, *Pastor Bonus*, 80 *AAS* 841-930 (1988), http://www.vatican.va/holy_father/john_paul_ii/apost_constitutions /documents  /hf_jp-ii_apc_19880628_pastor-bonus_en.html (apostolic constitutions listing high

The tort exception must be narrowly construed.  *See*, *e.g.*, *Haven v. Polska*, 215 F.3d 727, 731 (7th Cir. 2000) (holding that FSIA exceptions must be "narrowly construed"); *see also*, *e.g.*, *MacArthur Area Citizens Ass'n v. Republic of Peru*, 809 F.2d 918, 921 (D.C. Cir. 1987) ("[T]he legislative history counsels that the [tort] exception should be narrowly construed so as not to encompass the farthest reaches of common law."); *Asociacion de Reclamantes v. United Mexican States*, 735 F.2d 1517, 1525 (D.C. Cir. 1984) (declining to convert section 1605(a)(5) into "a broad exception"); *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 164 (2008) (jurisdiction of federal courts "is carefully guarded against expansion by judicial interpretation").

**B.      Factual Motion to Dismiss for Lack of Subject Matter Jurisdiction**

Federal courts "have a continuing obligation to inquire into the basis of subject-matter jurisdiction to satisfy themselves that jurisdiction to entertain an action exists."  *Campanella v. Commerce Exch. Bank*, 137 F.3d 885, 890 (6th Cir. 1998).  A challenge to a court's subject matter jurisdiction "may be raised at any stage in the proceedings."  *Schultz v. Gen. R.V. Ctr.*, 512 F.3d 754, 756 (6th Cir. 2008); FED. R. CIV. P. 12(h)(3).

"A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction may involve a facial attack or a factual attack."  *Am. Telecom Co. v. Republic of Lebanon*, 501 F.3d 534, 537 (6th Cir. 2007); *see also O'Bryan*, 556 F.3d at 376-77 ("As the district court correctly noted, the Holy See could still retain immunity if it could 'prove that the exceptions do not apply.'  Such proof would presumably amount to a 'factual attack' pursuant to Rule 12(b)(1).").  Where "there is a factual attack on the subject-matter jurisdiction alleged in the complaint, no presumptive truthfulness applies to the allegations."  *O'Bryan*, 556 F.3d at 377; *see also Gentek Bldg. Prod., Inc. v. Steel Peel Litig. Trust*, 491 F.3d 320, 330 (6th Cir. 2007).

When a jurisdictional challenge "raises a factual controversy, the district court must weigh the conflicting evidence to arrive at the factual predicate that subject-matter [jurisdiction] does or

---

officials of the Holy See); *see also*, *e.g.*, 1968 *Regolamento* arts. 3-5, Lena Decl., Exhs. C-D (identifying major and minor officials at the Holy See).

does not exist." *Gentek Bldg. Prod.*, 491 F.3d at 330.[5]  If the court determines that it lacks subject matter jurisdiction, it must dismiss the action.  FED. R. CIV. P. 12(h)(3).

### C.       The Parties' Burdens

Once the party claiming FSIA immunity establishes *prima facie* that it is a foreign state, "the burden of production shifts to the non-movant to show that an exception applies."  *O'Bryan*, 556 F.3d at 376.  The party claiming immunity "retains the burden of persuasion throughout this process."  *Id.*[6]  However, *Plaintiffs* have the burden of persuasion – not just production – with regard to the status of the Archbishop as the Holy See's employee.  *See Arriba Ltd. v. Petroleos Mexicanos*, 962 F.2d 528, 533-34 (5th Cir. 1992) ("[W]here, as here, jurisdiction depends on an allegation that the particular defendant was an agent of the sovereign, the plaintiff bears the burden of proving this relationship."); *see also*, *e.g.*, *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 447 (D.C. Cir. 1990).

Plaintiffs will have to proffer "probative and reliable" evidence to meet their burden.  *Gould, Inc. v. Pechiney Ugine Kuhlmann*, 853 F.2d 445, 452 (6th Cir. 1988).  The "self-serving arguments of counsel" do not meet a plaintiff's burden under the FSIA.  *Stena Rederi AB v. Comision de Contratos*, 923 F.2d 380, 389 (5th Cir. 1991).

## IV.      RELEVANT PROCEDURAL BACKGROUND

The procedural background of this case is lengthy and complex.  *See* Def. Holy See's Status Conf. Stmt., DN 138, at 3-11.  There are, however, two major aspects of the Sixth Circuit's ruling relevant for purposes of this motion.

First, as mentioned above, the Sixth Circuit rejected Plaintiffs' direct theories of liability

---

[5] Given that the presumptive truth of the allegations have fallen away, there is currently no known factual dispute that the Court needs to resolve.  In fact, all of the evidence set forth below either (a) is conceded by Plaintiffs' own expert, (b) has been in Plaintiffs' counsel's possession since 2002 or (c) is readily obtainable in Kentucky.

[6] There is some ambiguity in Sixth Circuit FSIA law as to the ultimate burden of persuasion. *See Am. Telecom Co.*, 501 F.3d at 537 ("When a Rule 12(b)(1) motion attacks the factual basis for jurisdiction, the district court must weigh the evidence and the plaintiff has the burden of proving that the court has jurisdiction over the subject matter.").

against the Holy See, holding that such claims were barred by the tort exception's requirement that the tortious act or omission occur entirely within the United States. *O'Bryan*, 556 F.3d at 385 ("[A]ny portion of plaintiffs' claims that relies upon acts committed by the Holy See abroad cannot survive."); *see also id.* at 382. Because the Sixth Circuit also determined that a vicarious liability claim based upon the priests' sexual abuse itself was barred, *id.* at 385, the only surviving claims were those based upon the tortious acts or omission of bishops. *See id.* at 386. For jurisdiction to lie over these remaining claims, "such bishops, archbishops and supervising personnel in the United States must have been a Holy See employee." *Id.*; *see also id.* at 387-88. The Sixth Circuit made it clear that the employment issue remained subject to a factual challenge under Rule 12(b)(1). *Id.* at 377; *see also* Mem. Op. at 11, 18.

Second, *Crimen* was critical to the Sixth Circuit's holding that the tort exception's discretionary function exclusion did not preclude jurisdiction over Plaintiffs' remaining claims. The Sixth Circuit characterized all of Plaintiffs' remaining claims as "akin to claims of negligent supervision" and acknowledged that negligent supervision claims were generally barred by the discretionary function exclusion. *Id.* at 388; *see also id.* at 384, *citing Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1217 (D.C. Cir. 1997) and *Carlyle v. Dep't of Army*, 674 F.2d 554, 557 (6th Cir. 1982). However, finding that "*all* of the claims advanced by plaintiffs stem from the promulgation of [*Crimen*] by the Holy See," *O'Bryan*, 556 F.3d at 380,[7] the Sixth Circuit held:

> According to the allegations in plaintiffs' complaint, theories of liability premised upon the supervision of the allegedly abusive clergy do not implicate the discretionary function exception to the tortious act exception *because the terms of the supervision were not discretionary*. According to the complaint, [*Crimen*] "impose[d] the highest level of secrecy on the handling of clergy sexual abuse matters." Plaintiffs contend that this required secrecy prohibited Holy See personnel from, among other things, reporting childhood sexual abuse to government authorities. *Id.* Thus, following [*Crimen*] cannot, on the pleadings in plaintiffs' complaint, be deemed discretionary.

*Id.* at 387.

The Sixth Circuit relied on *Crimen* as the basis for its jurisdictional holding at Plaintiffs'

_____

[7] Plaintiffs have repeatedly identified *Crimen* as "the 1962 Policy" during the course of this litigation (*see*, *e.g.*, DN 92-2, at 4, 7), and this brief will use the term *Crimen* to avoid confusion.

urging. Plaintiffs' counsel argued on appeal that *Crimen* was "central" to Plaintiffs' claims and "forms the basis for this lawsuit." Pltfs' 4th Brf. on Cross-Appeal at 10, Lena Decl., Exh. E; Transcript of March 18, 2008 Oral Argument ("Sixth Circuit Oral Argument") at 23, Lena Decl., Exh. F. Plaintiffs argued that, "in flagrant disregard for state reporting statutes," *Crimen* required "U.S. bishops to refuse to report clergy child sexual abuse to authorities." Pltfs' 2d Brf. on Cross-Appeal at 8, 11-12, Lena Decl., Exh. G. And Plaintiffs' counsel claimed that Plaintiffs' injuries were caused by "the delivery into the United States of [*Crimen*]." Sixth Circuit Oral Argument at 26.[8]

## V.    RELEVANT FACTUAL BACKGROUND

### A.    The Relationship Between the Holy See and the Archbishop of Louisville

Facts regarding the relationship between the Holy See and the Archbishop of Louisville ("the Archbishop") are readily ascertainable from evidence here in Kentucky. The following is based upon the Declaration of Dr. Brian Reynolds, the Chancellor and Chief Administrative Officer of the Louisville Archdiocese. Declaration of Dr. Brian Reynolds ("Reynolds Decl.") ¶ 1, filed herewith.[9]

The Archbishop is the sole member and legal representative of the Archdiocese of Louisville ("the Archdiocese"), which is a civil corporate entity with the legal name "Roman Catholic Bishop of Louisville, a corporation sole." Reynolds Decl. ¶ 3; *see also id.*, Exh. A.[10] The Archdiocese currently comprises of 24 counties in central Kentucky. Reynolds Decl. ¶ 4. There are 111 parishes and missions within the Archdiocese, and over 40 K-12 schools. Reynolds Decl. ¶¶ 4, 6.

The Archdiocese holds property in its own name, contracts in its own name, and can sue or

---

[8] On the heels of litigation in this Court wherein it became clear that Plaintiffs' own expert contradicted Plaintiffs' *Crimen* theory (*see* DN 102, at 3-15), Plaintiffs petitioned the Sixth Circuit to have references to *Crimen* in its opinion replaced by "policies and directives of the Holy See regarding clergy sexual abuse." Pet. for Reh'g, at 6-9, Lena Decl., Exh. A. The Sixth Circuit denied Plaintiffs' petition. Lena Decl., Exh. B.

[9] Dr. Reynolds was deposed by Plaintiffs' counsel in October 2002 during the litigation against the Archdiocese of Louisville (hereinafter "Jefferson County Archdiocese Litigation").

[10] In over 240 complaints in the Jefferson County Archdiocese Litigation, Plaintiffs' counsel sued the Archdiocese as "the Roman Catholic Bishop of Louisville" and alleged that it was "a non-profit corporation with its principal offices in Louisville, Jefferson County, Kentucky." *See, e.g.*, DN 152-2, Done Decl., Exh. A.

be sued in its own name.  Reynolds Decl. ¶ 3.  The Archdiocese has its own management structure, budget, financial accounts, legal counsel, archives, and insurance.  Reynolds Decl. ¶¶ 5, 10-15, 24-26.  Day-to-day operations of the Archdiocese are conducted by the Archbishop, either directly or through lay and clergy staff, with the Archbishop having final authority.  Reynolds Decl. ¶ 27.

With approximately 4,000 employees, the Archdiocese is the eighth-largest private employer in Jefferson County.  Reynolds Decl. ¶ 17.  The Archdiocese hires and fires its employees, maintains its personnel files, and pays the salaries of, and provides benefits to, its employees.  Labor relations in the Archdiocese are within the control of the Archbishop.  *Id.*; *see also id.* ¶¶ 18-19.

The Archbishop, at his discretion, makes a range of major decisions on the Archdiocese's behalf.  The Archbishop can, for example, create separate legal entities, promulgate a range of policies applicable within the Archdiocese's territory, and undertake large, multi-million dollar projects.  Reynolds Decl. ¶¶ 9, 16, 28-29.

The Archdiocese pays for the education of candidates for the priesthood; after priests are ordained, they are incardinated in the Archdiocese.  Reynolds Decl. ¶ 20.  The Archbishop, in his capacity as the head of the Archdiocese, assigns priests to a particular parish or office, and controls the geographical boundaries of parishes within his diocese.  Reynolds Decl. ¶ 23.

The Archbishop does not work on premises or in facilities owned or operated by the Holy See, and the Holy See does not supply the Archbishop's equipment or instrumentalities of his work.  Reynolds Decl. ¶ 34.  The Holy See does not pay the Archbishop's compensation or payroll taxes, and does not provide the Archbishop with health insurance, life insurance, sick leave, disability benefits, workers' compensation coverage, or retirement/pension benefits.  Reynolds Decl. ¶¶ 31-33.

**B.     Facts Relating to the Priests Who Abused Plaintiffs**

Although the Complaint does not allege their identity, there exists no dispute regarding which priests have been accused in this case.[11]  Turner filed suit against the Archdiocese for abuse by Louis Miller.  DN 152-2, Done Decl., Exh. A.  Poppe previously told the press that he was abused by

---

[11] For purposes of this motion, the Holy See will assume that each plaintiff was abused by the Catholic priest identified herein.

Arthur Wood, a priest who was the subject of dozens of lawsuits in 2002.  *See* DN 102, at 11 n.11; Lena Decl., Exh. H.  O'Bryan testified in his deposition that Lawrence Kuntz abused him in 1928.

In February and April 2010, Holy See counsel received from the Archdiocese all documents relating to Miller and Wood that had been previously provided to Plaintiffs' counsel William McMurry during the Jefferson County Archdiocese Litigation.  Reynolds Decl. ¶¶ 41-43.  These documents include approximately 400 pages related to Miller and 200 pages related to Wood.[12]

### 1.     Louis Miller

Miller was a priest in the Archdiocese of Louisville for 46 years.  The Archbishop assigned Miller to his first position in 1956, as associate pastor at Holy Spirit in Louisville.  DMI 245.[13]  After several other assignments, the Archbishop appointed Miller as associate pastor at St. Aloysius Parish in 1972, where Miller later abused Turner.  DMI 117; *see also* DN 152-2, Done Decl., Exh. A.

Throughout Miller's time as an active priest, the Archbishop appointed him to various positions within the Archdiocese.  DMI 113, 116, 118-20, 190, 232.  Miller repeatedly acknowledged the Archbishop's authority to make such decisions.  *See, e.g.*, Personnel Commission Form DMI 54 ("As the Archbishop so wills or the Diocese so needs, I'll do what I can, when they wish!"); *id.*, 63 ("[T]he assignment of my Archbishop is my wish."); *id.*, 47 ("If the Personnel Commission and Archbishop McDonough suggest I change – so be it.").[14]

Even apart from assignments, the Archdiocese made many decisions regarding Miller throughout the years.  These decisions ranged from the small – such as granting leave to go on a retreat or vacation (DMI 233-38, 243-44) – to the more significant, such as regarding Miller's residence, pay, pension, and insurance.  *See, e.g.*, DMI 174, 357 (living arrangements); 136-39, 143-

---

[12]  The Archdiocese documents regarding Miller and Wood are attached to the Lena Declaration.  *See* Lena Decl., Exhs. I-J; *see also* Reynolds Decl. ¶ 43.

[13]  In the early to mid-1950s, prior to his ordination, the Archdiocese received information regarding Miller's fitness to be a priest.  DMI 246-47, 251, 255-58, 260, 264-67, 281, 306.

[14]  Miller regularly provided the Archdiocese with detailed information regarding his assignment preferences, as well as other professional and personal information.  *See, e.g.*, DMI 4-13, 15-17, 19-27, 29-43, 45-46, 51-52, 55-56, 63, 93-94.

44 (pension); 69, 70-71, 75, 78, 141, 141 (salary and benefits); 68, 73, 122-126 (health insurance).

Most significantly, the file shows that the Archbishop directly addressed issues arising from Miller's dangerous propensities with regard to children.  While almost all such information is from the period after 1990, there are hints that the Archbishop may have been aware of problems with Miller earlier.[15]  For example, when Miller sought permission for a three-week vacation from Archbishop Floersh for in 1962, Floersh granted permission but remarked that "it is necessary at all times for you to abstain from visiting places and indulging in activities that are unbecoming to the priesthood."  DMI 244.  More tellingly, a 1976 letter from Miller's therapist to Archbishop McDonough states: "Louis [Miller] has been involved in therapy and is making some progress.  I think he is capable to handle a temporary assignment at this point. . . ."  DMI 215.  Archbishop McDonough assigned Miller to a temporary parish position that same month.  DMI 118.

When the Archdiocese received information regarding Miller's abuse of minors in 1990, the Archbishop limited his assignments and access to children, paid for and evaluated his progress in therapy, and settled claims and lawsuits brought by victims.  *See, e.g.*, DMI 339 (1990 Miller letter to Archbishop Kelly re: therapy); 405-10 (1990 psychiatric evaluation by Dr. Brush to Archbishop Kelly); 411-13 (1990 psychological evaluation from Dr. Tureen to Archbishop Kelly); 414-15 (1993 letter from Dr. Wagner to Archbishop Kelly setting forth conditions that Miller agreed to follow); 417-54 (therapy payments); 358 (1993 Archbishop Kelly letter to Dr. Wagner in response); *see also* 308-13 (1991 settlement of claims); 351-53 (1996 settlement of claims).[16]

The documents demonstrate that the Archbishop used his discretion and judgment in making decisions regarding Miller.  *See* DMI 388 (Archbishop Kelly memorandum from 1998 stating that "*[t]he judgments Dr. Wagner and myself* conclude that no change needs to be made."); 404 (1990

---

[15] Turner alleges abuse in the mid 1970s.  Cmplt. ¶ 100.  Although it is difficult to ascertain from the archdiocesan documents whether the Archbishop knew of Miller's propensities before that time, there appears to be a basis to conclude that the Archbishop had prior knowledge.  The Holy See therefore only raises that  issue vis-a-vis Wood and Kuntz.  *See infra* at 20-21.

[16] There is nothing definitive in the file regarding Miller's post-1990 conduct vis-a-vis children.

letter from Archbishop Kelly to Dr. Wagner, discussing difficulty in finding assignment for Miller);

74 (1990 memorandum from Director of the Office of Clergy Personnel, stating "Father Miller was

very frank and forthcoming about his present position in the archdiocese.  I acknowledged that the

archbishop had indicated to me and to the Priests' Personnel Board that there would be restrictions

on the type of ministry in which he could be involved at this time."); 164 (undated memorandum by

Archbishop Kelly regarding telephone conversation with Dr. Wagner, stating that there would be "no

quick fix" for Miller); 115 (1991 memorandum by Archbishop Kelly stating "[t]here will have to be

certain restrictions on Father Miller's activities.  I will deal with Father Medley directly about

these."); *see also* 118, 215. As Archbishop Kelly summarized in an undated memorandum:

> Father Miller has acknowledged to me the existence of a serious personal problem.
> As a result of this conversation: 1) I have removed him from any ministry which
> would involve children; 2) I have referred him to Dr. Dennis Wagner, a recognized
> psychologist with expertise in the area of Father Miller's problem; 3) Dr. Wagner
> has indicated that Father Miller is not a threat provided he observes the restrictions
> placed on his ministry; and, 4) I have assigned him to ministry with the ageing, at
> Sacred Heart Home, Louisville, after fully disclosing the nature of Father Miller's
> problem to the authorities of the Home.

DMI 161.

### 2.    Arthur Wood

Arthur Wood's file has characteristics similar to the Miller documents.  The Archbishop

assigned Wood to parishes and other positions.  *See* WOOD.DOC 147, 152-54, 159, 161-62, 167.

At times, Wood corresponded with the Archbishop regarding his assignments.  *See*, *e.g.*,

WOOD.DOC 163-66.  Wood kept the Archdiocese apprised of his health, and sought permission

from the Archbishop to attend conventions or retreats.  *See* WOOD.DOC 101-03, 114-18, 128-30,

181; *see also* 155-56, 170.  When complaints (unrelated to sexual abuse) surfaced in 1979 regarding

Wood's performance as chaplain, the issue was directly addressed by the Archbishop.  WOOD.DOC

181-82.  Similarly, when complaints were made in 1978 about damages to a house rented by Wood

on behalf of four men in their early 20s, the Archbishop addressed the issue.  WOOD.DOC 169.

Poppe alleges abuse by Wood in the "early 1960s."  Cmplt. ¶ 64; *see also supra* at 8-9.[17]

---

[17] As stated above, the Complaint does not identify Wood, but Plaintiffs did not object to the
Holy See's reliance on press reports wherein Poppe identified Wood as his abuser.  *See supra* at 9.

Wood was not ordained a priest until 1959.  *See*, *e.g.*, WOOD.DOC 142, 145.  The pre-1959 information in the file regarding Wood indicates that he was viewed as moral and devout at the time.

Indeed, regarding Wood's fitness to be a priest, the Rector of the seminary attended by Wood stated:

> No irregularities or impediments were found in Mr. Wood.  He appears to be animated with the highest motives in aspiring to the priesthood.  He is solidly religious in his outlook, is humble, charitable, and earnest.  He is conscientious and devout in the performance of his spiritual exercises and entirely dependable in character. . . . He not only does not consort with trouble-makers but exerts a general wholesome influence in his quiet pleasant way on the Seminary spirit. . . . His life and conduct in the Seminary gives promise in every way that he will become a good priest.

WOOD.DOC 89; *see also*, *e.g.*, 131 (1958 report stating that Wood is "reliable and dependable"); 100 (1956 report stating that Wood is a "respectful seminarian, always polite and cooperative, mature, with good judgment"); 56 (1951 letter stating that Wood "is a young man of very good habits and of solid moral character").

Wood's first transfer occurred on July 7, 1965, nearly six years into his priesthood. WOOD.DOC 152.  Wood was thereafter transferred frequently, and then assigned in non-parish positions – perhaps suggesting that his propensities may have been known after 1965, *i.e.*, *after* the abuse of Poppe.  There is no evidence in the archdiocesan file suggesting that the Archbishop knew of Wood's dangerous propensities by the time of Poppe's abuse in the early 1960s.

### 3.    Lawrence Kuntz

Plaintiff O'Bryan alleges abuse by Kuntz in 1928, when O'Bryan was seven years old.  As O'Bryan acknowledged in his deposition, there is no living witness other than O'Bryan himself to either the incident or its aftermath.  Deposition of James H. O'Bryan, July 7-8, 2006 ("O'Bryan Depo.") at 225.[18]

O'Bryan testified that Kuntz "came to St. Cecilia's Parish [in Louisville, Kentucky] in 1928" and that he "was new to the parish."  O'Bryan Depo. at 20.  He testified that Kuntz was not a teacher

---

[18] While Kuntz's personnel file is extant, it remains in the possession of a Province of the Resurrectionist Order ("Province") in Canada.  Lena Decl. ¶¶ 7-8.  However, expressing concern about being drawn into litigation in this Court, the Province refused, through its counsel, to provide the file to the Holy See.  *Id.* ¶¶ 10-11.  As a result, O'Bryan's testimony is currently the sole source of information regarding Kuntz.

at the St. Cecilia's school attended by O'Bryan; instead, he was a parish priest, and the local pastor was his superior.  *Id.* at 198, 200.

On the day of the incident, O'Bryan was standing on a step stool re-shelving books at the school library after school.  O'Bryan states that Kuntz came up behind him, "put his right hand in the pocket of my pants and fondled me."  *Id.* at 23.  The incident lasted a few seconds.  *Id.* at 25.

O'Bryan testified that he told his mother the same day.  He states that she took him back to the school, where she confronted the head pastor.  *Id.* at 24.  O'Bryan testified that later that evening "[t]he pastor came up to our apartment, [and] told us that [Kuntz] denied fondling me.  [Kuntz] said that he saw me lose my balance, and he caught me, so I wouldn't fall off this ladder."  *Id.* at 25; *see also id.* at 215 (stating that the pastor "told my mother that [Kuntz] denied this molestation.  That all he was trying to do was to keep me from falling off of this step stool that I was standing on.").  The pastor's visit with the family was short.  *Id.* at 215.

After speaking with Kuntz, O'Bryan's father disbelieved O'Bryan's version and believed Kuntz's version.  *Id.* at 26; *see also id.* at 220.  O'Bryan was taken out of the school by his mother, and there was no other incident with Kuntz.  *Id.* at 205.

O'Bryan was never interviewed by anyone regarding the incident and never gave a statement regarding the incident.  *Id.* at 215.  He has no knowledge of anyone ever asking any member of his family to keep the incident quiet.  *Id.* at 210.

O'Bryan is unaware of any link whatsoever between the Holy See and Kuntz.  *Id.* at 203.  He has no knowledge of whether Kuntz had ever previously committed such an act with any other child.  *Id.* at 211.  He has no knowledge of whether the Archbishop or the Province knew of prior incidents involving Kuntz.  *Id.* at 224.

## C.   *Crimen sollicitationis* **and Plaintiffs' Claims**

As stated above, Plaintiffs' counsel has argued that *Crimen* "forms the basis of this lawsuit." Sixth Circuit Oral Argument at 23.  The Sixth Circuit accepted Plaintiffs' argument, holding that "*all* of the claims advanced by plaintiffs stem from the promulgation of [*Crimen*] by the Holy See." *O'Bryan*, 556 F.3d at 380.  For purposes of this motion, one critical question is whether there is any substance underlying the claim that Plaintiffs' injuries were caused by "the delivery into the United

States of [*Crimen*]."  Sixth Circuit Oral Argument at 26.

*Crimen* was directed primarily to the canonical crime of solicitation in the confessional, an offense that occurred when a priest (during or immediately before or after confession) attempted to solicit a penitent to immoral acts or imprudently had improper conversations or interactions with the penitient.[19]  First Declaration of Dr. Edward N. Peters in Supp. of Def. Holy See's Second Motion to Dismiss for Lack of Subject Matter Jurisdiction ("Peters First Decl.") ¶ 40; Doyle, *The 1962 Vatican Document*, at 2 Lena Decl., Exh. L (stating that *Crimen*'s confidentiality provisions are "primarily rooted in the fact that [the document] deals with the sacrament of penance to which is attached inviolable secrecy").[20]  The offense the canon law describes as *de crimine pessimo*, which includes clergy sexual misconduct with children, was discussed only briefly at the end of *Crimen*; the document states that "[e]verything laid down up to this point concerning the crime of solicitation is also valid, with the change of those things which the nature of the matter necessarily requires, for the *crimen pessimum*."  Peters First Decl. ¶ 39; *Crimen* no. 72.

The Holy See's expert, Dr. Edward Peters, and Plaintiffs' proffered expert, Father Thomas Doyle, *agree* on four key facts regarding *Crimen*.

***Crimen*'s Formal Canonical Procedure:** First, both Dr. Peters and Doyle agree that *Crimen* set forth procedural norms for certain formal canonical proceedings.  Peters First Decl. ¶ 40; Declaration of Thomas P. Doyle ¶ 6, DN 116-2 ("Doyle Reply Decl."); *see also* Cmplt. ¶ 45.  The formal procedure set forth in *Crimen* provided for the participation of the bishop (or his delegate) as judge, the promoter of justice (akin to a prosecutor), the advocate of the defendant (akin to

---

[19] If it occurred with a minor, the crime of solicitation could be a civil offense as well.  However, as a canonical matter, the crime of solicitation covered situations involving penitents of any age, and included conversations as well as physical acts.  *Crimen* no. 1.

[20] All of the prior statements by Doyle cited or quoted herein were introduced by the Holy See – without objection from Plaintiffs – in the litigation regarding Plaintiffs' motion to take the Pope's deposition in 2008.  *See* DN 102-5, 102-8 to 102-13, 102-16, 102-19 to 102-24.  Despite Doyle's prior statements regarding *Crimen* that contradicted Plaintiffs' core theories of the case, Plaintiffs re-proffered Doyle as an expert in connection with their reply brief, and Doyle did not repudiate any of his prior statements.  *See* Doyle Reply Decl., *passim*.

defense counsel), and the notary (analogous to a court reporter).  Peters First Decl. ¶ 41; *see also* English Translation of *Crimen*, nos. 5 and 7, Peters First Decl., Exh. C.

*Crimen* provided for proceedings to begin by written and formal accusation; the person making the accusation against the priest was to be placed under oath and questioned, and the statement was to be transcribed and signed.  Peters First Decl. ¶ 42; *Crimen* no. 23.  If the bishop, after consulting with the promoter of justice, deemed that the crime of solicitation had occurred, he was to perform a formal investigation.  Peters First Decl. ¶ 43; *Crimen* nos. 27, 29.  The investigation was to include the review of archives and the taking of testimony from witnesses. Peters First Decl. ¶ 44; *Crimen* nos. 30, 33.  If the investigation revealed "certain or at least probable arguments" for bringing the accusation to trial, the priest was to be cited and formally charged. *Crimen* no. 42(d); Peters First Decl. ¶ 45(d).

The trial proceedings were to begin by arraignment of the accused.  Peters First Decl. ¶ 47; *Crimen* nos. 47-48, 50.  The priest was be offered the opportunity to confess, in which case the matter was to proceed to sentencing.  Peters First Decl. ¶ 47; *Crimen* nos. 48-49.  If the priest did not confess, the bishop could place him under special supervision during the pendency of trial proceedings.  Peters First Decl. ¶ 47; *Crimen* no. 47.  Trial was to proceed by both the promoter of justice and the defense presenting their respective arguments to the bishop.  Peters First Decl. ¶ 48; *Crimen* no. 55.  The bishop was to thereafter pronounce the sentence, with the defendant and the promoter of justice having the right to appeal to the Supreme Tribunal of the Holy Office.  Peters First Decl. ¶ 48; *Crimen* nos. 56-58.

*Crimen*'s **Written Procedure:** Both Dr. Peters and Doyle agree that *Crimen* provided for a *written* procedure.  Peters First Decl. ¶ 40 ("Under *Crimen* . . . all judicial acts were required to be in writing."); *see also* Doyle Apr. 5, 2005 Trial Testimony, at 1307, Lena Decl., Exh. M (stating that both the investigative and judicial procedure under *Crimen* "*must be memorialized in writing*"); *see also* Doyle Aug. 26, 2005 Deposition, at 90, Lena Decl., Exh. N.  *Crimen* is explicit that each step of the procedure was to be memorialized in writing.  *Crimen* nos. 5, 7, 14, 23-27, 33, 36, 49, 55, 57; Peters First Decl. ¶¶ 41-44, 48.

No Evidence of *Crimen*'s Use With Regard to Miller, Wood or Kuntz: Dr. Peters and

Doyle also agree that there is *no* evidence regarding *Crimen*'s use with regard to Miller, Wood or Kuntz – the three priests at issue.[21]   Dr. Peters reviewed all of the documents provided by the Archdiocese to Plaintiffs' counsel in 2002, as well as the Miller criminal case file and the O'Bryan deposition.   Based upon his review, Dr. Peters determined that *Crimen* is neither found nor referenced in the Archdiocese documents or the criminal file.  Peters First Decl. ¶ 64(a).  Moreover, Dr. Peters concludes that "[n]one of the canonical documentation that must be generated in cases applying *Crimen* . . . are found within these documents," and that "[n]one of the actions taken by ecclesiastical officials in the cases as described within these documents appear to be correlated to *Crimen*."  Peters First Decl. ¶¶ 64(c)-(d).  In short, Dr. Peters determined that "there is no evidence in these documents that any version of *Crimen* played even the slightest role in the handling of these cases."  Peters First Decl. ¶ 65.

Plaintiffs' expert *agrees*.  Even though Plaintiffs' counsel had over 3,000 pages of discovery obtained from the Archdiocese in the 2002-2003 litigation, and even though Doyle states that *Crimen* set forth procedure that had to be memorialized in writing, Doyle conceded that he did not find "*any* written evidence that the procedures outlined in the *Crimen* were used in a prosecution in the archdiocese of Louisville."  Doyle Reply Decl. ¶ 22.

Doyle's conclusion is not surprising.  Doyle claims to have "studied documentation in cases from approximately 190 of the 195 Catholic dioceses in the United States [97%]" and "reviewed more than 1,500 priest personnel files."  Doyle Decl. ¶ 5, DN 92-3.  However, Doyle has stated that "*no documentary evidence* produced by dioceses in civil cases between 1985 and the present contained *any reference to this document or any indication that the prescribed norms were ever followed*."  Thomas Doyle, et al., CANONICAL HISTORY OF CLERICAL SEXUAL ABUSE: AN OVERVIEW, at 60 (2004), Lena Decl., Exh. O; *see also*, *e.g.*, Doyle Aug. 8, 2005 Declaration, at 16-

---

[21]  For Plaintiffs' to establish the claimed causal link between *Crimen* and their injuries, they would have to show that the use of the *Crimen* procedure *preceded* their injuries, and that *Crimen*'s confidentiality provisions resulted in secrecy about *prior* allegations of abuse by the priests at issue. It is worth noting that in over six years of litigation – including in Plaintiffs' motion to depose the Pope regarding *Crimen* – Plaintiffs have never provided any evidence linking *Crimen* to their claims.

17, Lena Decl., Exh. P ("[T[here is little if any evidence that the document was ever referred to in any of the hundreds of civil cases brought against dioceses and religious communities over the past 15 years."); Doyle, *The 1962 Vatican Document*, at 3, Lena Decl., Exh. L (stating that it is "probably true" that "this document is obscure and probably had remained unknown to the vast majority of bishops . . . until it was cited in the new norms issued in 2001").[22]

**_Crimen_ Did Not Mandate Non-Reporting of Child Abuse:** At the heart of Plaintiffs' case is that *Crimen* mandated bishops to disobey Kentucky's child abuse reporting statute. Once again, both Dr. Peters and Doyle *agree* that Plaintiffs are wrong. In fact, both Dr. Peters and Doyle agree that canon law cannot trump civil law reporting requirements (Peters First Decl. ¶ 56; Doyle May 30, 2006 Declaration at 6, Lena Decl., Exh. Q); that nothing in *Crimen* could be interpreted to prevent reporting to law enforcement prior to the initiation of the canonical process (Peters First Decl. ¶ 55; Doyle, *The 1962 Vatican Instruction* (Nov. 1, 2006), at 9, Lena Decl., Exh. R); and that *Crimen* nowhere addressed child abuse reporting statutes (Peters First Decl. ¶ 53; Doyle Aug. 26, 2005 Deposition at 94-95, Lena Decl., Exh. N). In addition, Dr. Peters explains:

- *Crimen*'s confidentiality provisions only applied in the context of a formal canonical process; if the bishop chose (like the Archbishop) to handle the matter informally, *Crimen*'s confidentiality provisions would not apply. Peters First Decl. ¶ 54.

- A bishop had the discretion under the canon law to suspend a canonical proceeding, which he could do freely if he determined there was a conflict between *Crimen*'s confidentiality provisions and a civil law reporting requirement. Peters First Decl. ¶ 57.

- *Crimen*'s *mutatis mutandis* clause – which applied *Crimen*'s procedural norms relating to the confessional to child abuse case "with the change of those things which the nature of the matter necessarily requires" (*Crimen* no. 72) – provided ample flexibility to comply with civil reporting requirements. Peters First Decl. ¶ 58.

- *Crimen*'s confidentiality provisions incorporated accepted exceptions provided by canon law, which would have permitted disclosure of child abuse allegations. Peters First Decl. ¶¶ 59-62.

---

[22] The lack of evidence of *Crimen*'s use in the Archdiocese is apparent from other sources as well. For example, Dr. Reynolds – the custodian of the Archdiocese's records who gathered "all of the documents in the possession of the Archdiocese that made any reference to allegations of childhood sexual contact occurring between 1955 and October 2002" for the Jefferson County Archdiocese Litigation – did not find any copy of *Crimen* in the Archdiocese files. Reynolds Decl. ¶¶ 42, 44.

## VI.    ARGUMENT

The tort exception's requirements are not met for three reasons.  First, because *Crimen*  was not used with regard to the three priests at issue, and because *Crimen* did not mandate non-compliance with civil reporting requirements, Plaintiffs' claims are barred by the tort exception's discretionary function exclusion.  Second, with regard to priests Kuntz and Wood, there is no evidence showing that the Archbishop committed, as required, a tortious act or omission that caused O'Bryan and Poppe's injuries.  Third, the Archbishop is not the Holy See's employee.  Indeed, the relationship between the Archbishop and the Holy See does not satisfy *any* of the employment factors, thereby precluding a finding of subject matter jurisdiction.

### A.    The Tort Exception's Discretionary Function Exclusion Bars Plaintiffs' Claims

The Sixth Circuit held that Plaintiffs' claims were not barred by the tort exception's discretionary function exclusion only because Plaintiffs alleged that "the terms of the supervision [of clergy] were not discretionary" under *Crimen*, which "prohibited Holy See personnel from, among other things, reporting childhood sexual abuse to government authorities."  *O'Bryan*, 556 F.3d at 387.  Given that, as a matter of fact, *Crimen* had no such effect, and indeed played no role whatsoever in Plaintiffs' cases, Plaintiffs' claims are barred by the discretionary function exclusion.

As set forth above, there does not appear to be any dispute about the lack of any link between *Crimen* and the three priests at issue.  The Miller personnel file reveals that the bishop handled Miller's problems informally, with the assistance of therapists.  Wood, in turn, had just become a priest by the time of Poppe's abuse, and his file contains no reference to either a formal proceeding or to a prior report to the Archbishop of abuse by Wood.  O'Bryan's testimony demonstrates that his report of abuse was handled informally, by a short meeting with the pastor rather than any canonical proceeding.  Dr. Reynolds never saw a copy of *Crimen* in the Archdiocese files.  And Plaintiffs' expert and Dr. Peters agree that there is no evidence of *Crimen*'s use in the Archdiocese.  *See supra* at 15-16.

Moreover, as stated above, both Dr. Peters and Plaintiffs' expert agree that *Crimen* did not mandate non-reporting of child abuse claims.  *See supra* at 17.  As a result, even *if* Plaintiffs had any evidence of *Crimen*'s use with regard to the priests at issue, it would not constitute a "mandatory" policy precluding the Archbishop's exercise of discretion; in fact, both Dr. Peters and Doyle state

that a bishop would have had ample discretion under *Crimen* to report an incident of child abuse. *See supra* at 17.

Plaintiffs' counsel have made much of *Crimen* in this case, stating that it "forms the basis" of their lawsuit and is "central" to their claims. The rhetoric by Plaintiffs' counsel has been heated. The evidence has been non-existent. In nearly six years of litigation, Plaintiffs' counsel have yet to produce a single piece of evidence suggesting that *Crimen* has any relationship with Plaintiffs' claims. In fact, their own expert undermines such a notion, and the documents in Plaintiffs' possession since 2002-2003 flatly contradict Plaintiffs' *Crimen* theory.

Absent any showing by Plaintiffs that *Crimen* "mandated" non-reporting with regard to the three priests at issue, Plaintiffs' claims are run-of-the-mill negligent supervision claims. *O'Bryan*, 556 F.3d at 388. As the Sixth Circuit opinion acknowledged – and as the Ninth Circuit recently reaffirmed in this very context – negligent supervision claims are barred by the FSIA's discretionary function exclusion. *Id.* at 384, *citing Burkhart*, 112 F.3d at 1217 and *Carlyle*, 674 F.2d at 557; *see also Doe v. Holy See*, 557 F.3d 1066, 1085 (9th Cir. 2009) ("[T]he tortious act exception does not provide jurisdiction over [the plaintiff's] negligent hiring, supervision, and failure to warn claims because they are barred by the discretionary function exclusion.").[23] This is, of course, in accord with long-established precedent. *See, e.g.*, *Burkhart*, 112 F.3d at 1217; *Carlyle*, 674 F.2d at 557; *see also Crete v. City of Lowell*, 418 F.3d 54, 64 (1st Cir. 2005) ("[U]niformly the federal circuit courts under the FTCA have found that employer decisions such as hiring, discipline, and termination of employees are within the discretionary function exception."); *Nurse v. United States*, 226 F.3d 996, 1001-02 (9th Cir. 2000) (stating that claims of negligent supervision "fall squarely within the discretionary function exception").[24]

---

[23] Given the uniformity principle underlying the FSIA, courts have repeatedly recognized the importance of avoiding circuit splits in this area. *See, e.g.*, *Vencedora Oceanica Navigacion, S.A. v. Compagnie Nationale Algerienne de Navigation*, 730 F.2d 195 (5th Cir. 1984) ("[I]t is highly desirable to avoid circuit conflicts in the sensitive area of sovereign immunity."); *Davis v. McCourt*, 226 F.3d 506, 509 (6th Cir. 2000) ("Congress enacted the FSIA in part to create a uniform body of law.").

[24] Notably, the FSIA's discretionary function exclusion has even "wider scope" than the FTCA's exception. *Fagot Rodriguez v. Republic of Costa Rica*, 139 F. Supp. 2d 173, 188 (D.P.R.

In short, it is clear that there is no factual link between *Crimen* and Plaintiffs' claims. Moreover, it is uncontested that *Crimen* permitted reporting of child abuse to law enforcement. Accordingly, there is no basis for Plaintiffs' claim that *Crimen* eliminated discretion in bishops' supervision of priests accused of child abuse. Plaintiffs' claims are therefore barred by the tort exception's discretionary function exclusion and must be dismissed. *O'Bryan*, 556 F.3d at 388; *Doe*, 557 F.3d at 1085.[25]

### B.  The Archbishop of Louisville Did Not Commit Any Tortious Acts or Omissions Injuring Plaintiffs O'Bryan and Poppe

Federal jurisdiction under the tort exception exists "only if . . . the plaintiff claims some injury 'caused by the tortious act or omission' of a foreign state." *Robinson*, 269 F.3d at 139-40, *quoting* 28 U.S.C. § 1605(a)(5). Even assuming *arguendo* that the Archbishop is the Holy See's employee, the Court lacks jurisdiction over O'Bryan and Poppe's claims because neither can show that the Archbishop committed a tortious act or omission.

Whether the "tortious act or omission" requirement is met is determined by state law. *Robinson*, 269 F.3d at 143. The Sixth Circuit held that Plaintiffs' remaining claims are akin to negligent supervision claims. *O'Bryan*, 556 F.3d at 388. Under Kentucky law, a negligent supervision claim requires prior knowledge of an employee's risk to others. *McDonald's Corp. v. Ogborn*, — S.W.3d —, 2009 WL 3877533, at *11 (Ky. App. Nov. 20, 2009); *Booker v. GTE.net LLC*, 350 F.3d 515, 517 (6th Cir. 2003) (same).

As set forth above, the Archdiocese files reveal positive information regarding Wood through his ordination in 1959; indeed, the reports to the Archbishop were filled with praise for Wood's

---

2001).

[25] Now that the Court may consider the actual facts that relate to jurisdiction, it is also uncontested that *Crimen* is a document that the Holy See promulgated in its discretion. Under the FSIA, a foreign sovereign is entitled to immunity from claims based upon the exercise of discretionary functions. Thus, regardless of whether *Crimen* represented a "policy" mandatory upon bishops or provided an instruction that left them with discretion, sovereign immunity obtains. As the Supreme Court has long explained in this context, "if a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation." *United States v. Gaubert*, 499 U.S. 315, 324 (1991).

conduct. *See supra* at 12.  Poppe was abused shortly thereafter, in the "early 1960s."  There is nothing in the file to suggest that the Archbishop learned of Wood's propensities between 1959 and the date of Poppe's abuse.

There is also no known evidence of prior knowledge with regard to Kuntz.  O'Bryan Depo. at 211, 224.  O'Bryan testified that Kuntz had arrived in the parish only "a few months" before, and nothing suggests reports of prior abuse between his arrival and the incident with O'Bryan.  *Id.*

Given the lack of prior knowledge regarding Wood and Kuntz, all of Poppe and O'Bryan's claims must be dismissed for lack of subject matter jurisdiction.

## C.   Because the Archbishop of Louisville was Not an Employee of the Holy See, this Court Lacks Subject Matter Jurisdiction Over All of Plaintiffs' Claims

Because the Archbishop was not an employee of the Holy See, this Court lacks subject matter jurisdiction over all of Plaintiffs' remaining claims.

The Sixth Circuit permitted only Plaintiffs' vicarious liability claims to move forward, "based upon the conduct of bishops, archbishops and Holy See personnel" in the United States.  *O'Bryan*, 556 F.3d at 386; *see also id.* at 387-88 (upholding claims based upon tortious acts or omission of "supervising employees" in the United States).  In so doing, the court of appeals held that Plaintiffs were not required to identify the relevant putative Holy See employee under the notice pleading requirements of Rule 8(a).  *Id.* at 383 n.9.  Given that this is a speaking motion to dismiss, Rule 8(a) no longer applies and the presumptive truthfulness of the allegations falls away.  The question therefore becomes who is the subject of Plaintiffs' vicarious liability theory.

There does not appear to be any dispute regarding who supervised the priests in question. Turner previously filed suit against the Archbishop, claiming that he had employed Miller and negligently supervised him.  DN 152-2, Done Decl., Exh. A.[26]  Plaintiffs' counsel similarly filed lawsuits against the Archbishop for negligently supervising Wood, the priest who abused Poppe. O'Bryan, in turn, testified that Kuntz was a local parish priest in Louisville; just like Miller and Wood, his superior within the Archdiocese would have been the Archbishop himself.

---

[26] The Holy See does not herein address whether the priests in question were the Archdiocese's employees at the time of the abuse.  Given that, as set forth below, it is clear that the Archbishop is not the Holy See's employee, the issue of the priest's employment by the Archbishop – a much closer question – does not need to be reached at this stage of the litigation.

Accordingly, this section will examine whether the Archbishop was a Holy See employee.

### 1.    The Court Should Apply General Common Law Principles to Determine Whether the Archbishop is a Holy See Employee

The FSIA's tort exception uses the term "employee" without further definition.  28 U.S.C. § 1605(a)(5).  There is not much authority regarding what law applies in determining employee status under the FSIA's tort exception.  In *Randolph v. Budget Rent-A-Car*, 97 F.3d 319 (9th Cir. 1996), the Ninth Circuit held that the issue was governed by state law.  *Id.* at 325.  In so doing, the court relied upon 28 U.S.C. section 1606 and *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba ("Bancec")*, 462 U.S. 611, 622 n.11 (1983).  This Court cited *Randolph* in its Opinion, stating that "[w]hether the American Catholic archbishops, bishops, and other clergy are employees of the Holy See would *appear* to be a question of Kentucky state law."  Mem. Op. at 9. The Sixth Circuit, in turn, stated that "as a rule" or "[a]s a general rule" state substantive law would apply to determine jurisdiction under the tort exception, and thereafter applied an employee status test that "Kentucky law *appear[ed]* to have adopted."  *O'Bryan*, 556 F.3d at 381, 382.

Although the matter is not dispositive – as set forth below, Plaintiffs' employment theory fails under either general common law or Kentucky law principles – the issue should be resolved under the general common law.[27]

First, neither 28 U.S.C. section 1606 nor *Bancec* provides authority for the proposition that state law applies to the question of whether an individual is a foreign state employee for purposes of an immunity determination.  Section 1606 states that "[a]s to any claim for relief *with respect to which a foreign state is not entitled to immunity under section 1605* or 1607 of this chapter, the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances."  28 U.S.C. § 1606.  It presupposes, in other words, an immunity determination

---

[27] If the Court disagrees and decides to apply Kentucky law under *Randolph*, the Holy See notes that even *Randolph* relied in part upon "federal law, public policy and common sense." *Randolph*, 97 F.3d at 326.  Moreover, Kentucky law has followed the general common law on the employee status issue, both from other States and from federal cases.  *See, e.g.*, *Papa John's Int'l, Inc. v. McCoy*, 244 S.W.3d 44, 54-56 (Ky. 2008); *Steilberg v. C2 Facility Solutions, LLC*, 275 S.W.3d 732, 735-36 (Ky. App. 2008).  As a result, the portions of the following discussion that address federal precedent or the general common law are relevant to the Court's determination, no matter which law the Court concludes should be applied.

*prior* to the full application of state substantive law. *Bancec*'s statement that "where state law provides a rule of liability governing private individuals, the FSIA requires the application of that rule to foreign states in like circumstances" was in the context of a *liability* determination; the Court had already concluded earlier in the opinion that the foreign state instrumentality lacked *immunity* under section 1607(c). *See Bancec*, 462 U.S. at 620-21 (discussing immunity); *compare id.* at 621-33 (addressing instrumentality's liability for foreign state's acts). *Bancec* therefore does not countenance the full application of state law in the immunity determination itself. *Cf. Verlinden*, 461 U.S. at 493-94 (holding that courts making an immunity determination under the FSIA's exceptions "must apply the detailed *federal* law standards set forth in the act").

Second, whereas state law does apply with regard to other issues under the tort exception – for example, as to whether conduct is tortious or within the scope of employment – FTCA precedent makes clear that the employee status issue is different. In fact, whereas FTCA cases apply state law for the scope-of-employment issue under 28 U.S.C. section 1346(b) (*see, e.g., Duty v. Dep't. of Interior*, 735 F.2d 1012, 1014 (6th Cir. 1984)), courts apply *federal* law for the purposes of determining whether a person is a government employee. *See, e.g., Fisher v. United States*, 356 F.2d 706, 708 (6th Cir. 1966) ("The question of who is a federal employee for the purposes of the Tort Claims Act is governed by federal law."). As the *Fisher* case demonstrates, that was already the rule under the FTCA before the enactment of the FSIA in 1976. Given that the FSIA's tort exception is based upon the FTCA,[28] Congress can be presumed to have intended that a similar rule apply under the FSIA. *See Lorillard v. Pons*, 434 U.S. 575, 581 (1978) ("[W]here . . . Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law . . . .").[29]

---

[28] H.R. Rep. No. 94-1487, at 21 (1976); *see also, e.g.,* Von Mehren, *The Foreign Sovereign Immunities Act of 1976*, 17 Colum. J. Transnat'l L. 33, 45 (1978); Belman, *New Departures in the Law of Sovereign Immunity*, 63 Am. Soc'y Int'l L. Proc. 182, 185, 195 (1969); George Kahale, III & Matias A. Vega, *Immunity and Jurisdiction: Toward a Uniform Body of Law in Actions Against Foreign States*, 18 Colum. J. Transnat'l L. 211, 256-57 (1979-80).

[29] In addition, given the equality principle underlying foreign sovereign immunity, *Republic of Philippines v. Pimentel*, 128 S. Ct. 2180, 2190 (2008), courts have longed looked to the treatment of the U.S. government under domestic law in determining the ambit of foreign sovereign immunity.

Third, as stated above, one of the central principles underlying the FSIA was the need to provide for uniformity in making foreign sovereign immunity determinations.  *See supra* at 19 n.23; *see also*, *e.g.*, *Verlinden*, 461 U.S. at 489 (recognizing "the importance of developing a uniform body of law in this area"); *Bancec*, 462 U.S. at 622 n.11 (stating that "matters bearing on the nation's foreign relations should not be left to divergent and perhaps parochial state interpretations").  As the United States Supreme Court has long held, uniformity concerns preclude application of state law in defining the term "employee" in a federal statute.  In fact, the Supreme Court has squarely held that "when Congress has used the term 'employee' without defining it, *we have concluded that Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine*."  *Clackamas Gastroent. Assoc. v. Wells*, 538 U.S. 440, 445 (2003); *see also*, *e.g.*, *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322-23 (1992).  This rule "reflects the fact that federal statutes are generally intended to have uniform nationwide application." *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 741 (1989).

Given the close relationship between the FSIA's tort exception and the FTCA, and applicable Supreme Court precedent, the Court should use the general common law of agency to resolve whether the Archbishop is a Holy See "employee" for purposes of the FSIA.

### 2.      The Common Law Employment Test

Under general common law agency principles, an employer is "a principal who employs an agent to perform service in his affairs and who controls or has the right to control the physical conduct of the other in the performance of the service."  REST. 2D AGENCY § 2;[30] *see also*, *e.g.*, *Ky. Unemp't Ins. Comm'n v. Landmark Cmty. Newspapers*, 91 S.W.3d 575, 580 (Ky. 2002) ("The ability to control the specific details of the work is an important factor for a court . . . to consider.").  In determining whether a person is acting as a servant, the Court should consider:

---

*See*, *e.g.*, *Long v. The Tampico & Progresso*, 16 F. 491, 495 (S.D.N.Y. 1883) ("By international comity, and that tacit agreement which constitutes the law of nations, every government accords to every other friendly power the same respect to its dignity and sovereignty, and the same consequent immunity from suit . . . which it enjoys itself within its own dominions.").

[30] The Archbishop is not employed in the Holy See "affairs" and does not work on the Holy See's behalf.  That issue is addressed immediately below.

(1)     the method of payment;
(2)     the provision of employee benefits;
(3)     the tax treatment of the putative employee;
(4)     whether or not the one employed is engaged in a distinct occupation;
(5)     the skill required;
(6)     the source of the instrumentalities and tools;
(7)     the location of the work;
(8)     the extent of the putative employee's discretion over when and how long to work;
(9)     the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
(10)    the duration of the relationship between the parties;
(11)    the putative employee's role in hiring and paying assistants;
(12)    whether the work is part of the regular business of the putative employer;
(13)    whether the putative employer is in business; and
(14)    whether the parties believe they are creating an employment relationship.

*Reid*, 490 U.S. at 752 (1989); REST. 2D AGENCY § 220(2); *see also Landmark*, 91 S.W.3d at 579-80.[31]  "No one of these factors is determinative."  *Reid*, 490 U.S. at 752; *Landmark*, 91 S.W.3d at 580; *see also Zetter v. Griffith Aviation, Inc.*, No. 6: 03-218-DCR, 2006 WL 1117678, at *11 n.7 (E.D. Ky. Apr. 25, 2006) ("*Landmark* overruled a line of Kentucky cases which held that the right to control the details of the work was the most important factor . . . .").

### 3.     None of the Common Law Employment Factors is Met

#### a.     The Archbishop of Louisville was Not Acting on the Holy See's Behalf and was Not Employed in the Holy See's Affairs

At the outset, the common law employment test presupposes that the putative employer "hired" or "employed" the putative employee to act on its behalf or in its affairs.  *See*, *e.g.*, *Standard Oil Co. v. Anderson*, 212 U.S. 215, 221 (1909) (stating that "the master is answerable for the wrongs of his servant" because the servant "is conducting the master's affairs"); *Brandes v. United States*, 783 F.2d 895, 896-97 (9th Cir. 1986) (holding that a court should not apply the employee status test unless it has made the threshold determination that the person was working for the putative employer); *Johnson v. Louisville & N.R. Co.*, 394 S.W.2d 110, 113 (Ky. 1965) ("Unless the *work was being performed for the defendant* [in] some realistic sense, we cannot even start on the tortuous

---

[31] The Sixth Circuit stated that Kentucky law "appears to have" adopted Restatement Third Agency § 7.07 to define the term employee.  *O'Bryan*, 556 F.3d at 382, *citing Papa John's Int'l*, 244 S.W.3d at 51-52.  The relevant portion of Restatement Third Agency § 7.07 contains many of the same factors listed above.  *See* REST. 3D AGENCY § 7.07 cmt. f.

road toward a determination that the employee of another party may be labeled in law an 'employee' of defendant.") (emphasis in original).[32]

Setting aside the religious or theological relationship between the Holy See and the Archbishop – which, as set forth below, should not and cannot be considered by the Court – the Archbishop is the sole member and legal representative of the Archdiocese, a separate corporation. Reynolds Decl. ¶ 3.  The Archdiocese is large; it currently has 4,000 employees, 111 parishes and missions, over 40 schools, and numerous offices and programs.  Reynolds Decl. ¶¶ 4-7.  When the Archbishop acts within the Archdiocese – and, in particular, when the Archbishop makes decisions regarding the priests in his Archdiocese – he acts on behalf of the Archdiocese.  Reynolds Decl. ¶ 21; *see also*, *e.g.*, DMI 116 (appointment letter from Archbishop Kelly to Miller on Archdiocese letterhead); 162 (same), Lena Decl., Exh. I.[33]  There is no indication, anywhere in the archdiocesan documents, that the Archbishop ever purported to act on the Holy See's behalf.

The fact that the Holy See and the Archbishop both serve the worldwide Catholic Church does not mean that the Archbishop works on the Holy See's behalf or is employed in the Holy See's affairs.  Mere cooperation or coordination does not render a person an employee.  *Kelley v. S. Pac. Co.*, 419 U.S. 318, 326-27 (1974); *Asher v. Rack Conveyor Installation, Inc*., No. 09-5182, 2010 WL 1741092, at *9 (6th Cir. May 3, 2010); *Brown v. CSX Trans., Inc*., 13 S.W.3d 631, 633 (Ky. App. 1999).  Even if the Archbishop were determined to be an "essential" part of the Holy See's "operation," or performing "important activities" for the Holy See, that would not be enough.  *Local 777 v. NLRB*, 603 F.2d 862, 898 (D.C. Cir. 1978); *Lewis v. United States*, 680 F.2d 1239, 1242 (9th Cir. 1982).  Nor would the fact that the Archbishop confers a "benefit" to the Holy See be sufficient.  *Brucker v. United States*, 338 F.2d 427, 430 (9th Cir. 1964); *Shephard Elevator Co. v. Thomas*, 300 S.W.2d 782, 784 (Ky. 1957).

---

[32] There is, of course, also no "contract" between the Holy See and the Archbishop.  Reynolds Decl. ¶ 37.  As a result, although many of the cases assume that an individual is either an "employee" or an "independent contractor," the Archbishop is neither vis-a-vis the Holy See.  *Johnson*, 394 S.W.2d at 112.

[33] Plaintiffs' counsel's prior 242 lawsuits against the Archdiocese, as a separate corporation, demonstrate that counsel also believed that priest supervision decisions were made in the Archbishop's capacity as sole member of the civil corporation.

An employment relationship presupposes that an individual works on another's behalf or in another's affairs. Because neither is the case here, Plaintiffs cannot meet the tort exception's employee requirement.

### b. The Holy See Did Not Have the Requisite Control or Right to Control

#### i. The Holy See Did Not Have the Requisite Day-to-Day Operational Control

Whether under FSIA precedent, federal law, or Kentucky law, the control necessary to establish an employment relationship is day-to-day operational control. The Holy See did not have the requisite day-to-day operational control over the Archbishop to form an employment relationship.

As set forth above, the Archbishop is the sole member and legal representative of a separate corporation. *See supra* at 7; *see also* Reynolds Decl. ¶ 3; *id.*, Exh. A. As the Ninth Circuit recently held in this very context under FSIA, the Holy See would need to exercise day-to-day control over bishops and dioceses in the United States in order for the acts of such individuals and entities to be imputed to the Holy See:

> [The plaintiff's] complaint does not allege day-to-day, routine involvement of the Holy See in the affairs of the Archdiocese, the Order, and the Bishop. Instead, it alleges that the Holy See "creates, divides[,] and re-aligns dioceses, archdioceses and ecclesiastical provinces" and "gives final approval to the creation, division or suppression of provinces of religious orders." [The plaintiff] also alleges that the Holy See "promulgates and enforces the laws and regulations regarding the education, training[,] and standards of conduct and discipline for its members and those who serve in the governmental, administrative, judicial, educational[,] and pastoral workings of the Catholic [C]hurch world-wide." These factual allegations – that the Holy See participated in creating the corporations and continues to promulgate laws and regulations that apply to them – are . . . insufficient to overcome the presumption of separate juridical status.

*Doe*, 557 F.3d at 1079-80; *see also Dale v. Colagiovanni*, 443 F.3d 425, 429 (5th Cir. 2006); *Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 852 (D.C. Cir. 2000).

The same requirement applies under established federal precedent in determining whether an individual is an "employee" of the United States government. *See, e.g., United States v. Orleans*, 425 U.S. 807, 815 (1976) ("[T]he question . . . is not whether the community action agency receives federal money and must comply with federal standards and regulations, but whether its day-to-day operations are supervised by the Federal Government."); *Logue v. United States*, 412 U.S. 521, 530 (1973) (employees of contractor were not federal employees where "the day-to-day operations of the

contractor's facilities were to be in the hands of the contractor"); *Autery v. United States*, 424 F.3d 944, 957 (9th Cir. 2005) ("There must be substantial supervision over the day-to-day operations of the contractor in order to find that the individual was acting as a government employee.").[34] Federal courts also apply the day-to-day control test in the non-government context. *See, e.g., Campbell v. BNSF Ry. Co.*, 600 F.3d 667, 675 (6th Cir. 2010) (finding no employee status where the putative employer did not "in the *daily* course of the work exercise[] directive control over the details of the job performed by the individual . . . workmen") (emphasis in original); *Byars v. Bluff City News Co.*, 609 F.2d 843, 847 (6th Cir. 1979) (stating that a "classic example" of an independent contractor is someone "whose day-to-day activities are not subject to control by the employer"). And Kentucky courts apply the same operation day-to-day control test as well. *See, e.g., Papa John's Int'l*, 244 S.W.3d at 47 ("[W]e adopt a rule in which the franchisor is vicariously liable for the tortious conduct of the franchisee when it, in fact, has control or right of control over the *daily operation* of the specific aspect of the franchisee's business that is alleged to have caused the harm."); *In re Air Crash at Lexington*, No. 5:06-CV-316-KSF, 2008 WL 2945944, at *5 (E.D. Ky. July 8, 2008) (applying *Papa John's* test outside franchisor-franchisee context); *Phelps v. Louisville Water Co.*, 103 S.W.3d 46, 51 (Ky. 2003) (no agency relationship where putative principal did not control "day to day operations"); *Uninsured Employers' Fund v. Reliance Nat'l Indemnity Co.*, No. 2000-CA-002528-WC, 2003 WL 21826999, at *6 (Ky. App. Aug. 8, 2003) (no employment relationship where no relinquishing of "control" over "day-to-day operations").[35]

---

[34] Under basic comity principles, settled precedent under the FTCA should be applied under the FSIA. *See, e.g., Arriba Ltd. v. Petroleos Mexicanos*, 962 F.2d 528, 537 (5th Cir. 1992) ("It is unimaginable that FSIA would authorize broader exposure to suit of a foreign government instrumentality . . . than that of domestic governmental units.").

[35] Restatement section 220 discusses the control or right to control over the "physical conduct" of the putative employee or "details" of the work. REST. 2D AGENCY §§ 220(1), 220(2)(a). As courts have repeatedly recognized, that is the equivalent of day-to-day operational control. *See, e.g., Tsosie v. United States*, 452 F.3d 1161, 1163 (10th Cir. 2006) ("[T]he 'critical question' . . . is whether the federal government has the power to control the detailed physical performance of the individual. Under this 'control test,' we must determine whether the government supervises the individual's day-to-day operations."); *Berkman v. United States*, 957 F.2d 108, 113 (4th Cir. 1992) ("The test . . . is whether the contractor's detailed physical performance is subject to governmental supervision. Stated differently, a court must consider whether the government exercises day to-day

The case law is clear that the control element of employment is *not* satisfied by the mere establishment of policies or specifications. *See*, *e.g.*, *Orleans*, 425 U.S. at 817-18 (mandatory compliance with extensive policies and procedures not enough); *Weary v. Cochran*, 377 F.3d 522, 526 (6th Cir. 2004) (obligations to comply with rules and guidelines not enough); *Letnes v. United States*, 820 F.2d 1517, 1519 (9th Cir. 1987) (detailed regulations not evidence of employment relationship); *United Engineers & Constructors, Inc. v. Branham*, 550 S.W.2d 540, 543 (Ky. 1977) (written specifications not enough). Indeed, courts have viewed detailed policies or specifications as a sign of *non*-employment. *See Norton v. Murphy*, 661 F.2d 882, 884 (10th Cir. 1981) (stating that the "very length and detail of the contract" suggests an independent contractor relationship because "it is doubtful that a master-servant relationship, where the master tells the servant what to do and when to do it, would require a contract of the type here involved").

In addition, mere oversight – even if extensive – is not sufficient. *See N. Am. Van Lines, Inc. v. NLRB*, 869 F.2d 596, 599 (D.C. Cir. 1989) ("[G]lobal oversight . . . is fully compatible with the relationship between a company and an independent contractor."); *Sullivan v. Gen. Elec. Co.*, 226 F.2d 290, 291 (6th Cir. 1955) ("The mere fact that the employer reserves the right to supervise or inspect the work during its performance does not make the contractor a mere servant. . . ."); *Mason & Hoge Co. v. Highland*, 116 S.W. 320, 322 (Ky. App. 1909) (general supervision does not create employment relationship). Even daily or weekly reports are not enough. *See Asher*, 2010 WL 1741092, at *7 (daily progress report not enough); *Speen v. Crown Clothing Corp.*, 102 F.3d 625, 633 (1st Cir. 1996) (daily report "compatible with the status of either an independent contractor or employee"); *New Ind. Tobacco Warehouse v. Latham*, 282 S.W.2d 846, 848 (Ky.1955) (daily conferences did "not militate" against independent contractor status); *Carnes v. Dep't of Econ. Sec.*, 435 S.W.2d 758, 761 (Ky. 1968) (periodic visits and reports not enough).

Finally, the mere potential to exercise detailed control cannot create an employment relationship. *Gibson v. United States*, 567 F.2d 1237, 1242 (3d Cir. 1977) ("The fact of broad, supervisory control, or even the potential to exercise detailed control, cannot convert a contractor into an agent . . . ."); *Jennings v. United States*, 530 F. Supp. 40, 44 (D.D.C. 1981) (same); *Lipka v.*

_____

control over the performance of the work under the contract.").

*United States*, 369 F.2d 288, 291 (2d Cir. 1966) ("[r]eservation of power to control" not enough); *Lutz v. St. Paul Fire & Marine Ins. Co.*, No. 1:03-CV-750, 2005 WL 2372871, at *6 (S.D. Ohio Sept. 26, 2005) ("theoretical right to control" not enough); *cf. Latsko v. Nat'l Carloading Corp.*, 192 F.2d 905, 910 (6th Cir. 1951) ("occasional directions" not enough); *Kropp v. Douglas Aircraft Co.*, 329 F. Supp. 447, 469 (E.D.N.Y. 1971) ("general right of . . . control over work" insufficient).

The day-to-day operations of the Archdiocese are run by the Archbishop and his delegates. Reynolds Decl. ¶ 27. The Archdiocese – by and through the Archbishop – enters into contracts, purchases and sells property, maintains its own accounts, runs its own schools, creates separate entities, manages its own budget, conducts its own fundraising, has its own insurance, maintains its own financial and operations files, maintains its own archives, promulgates archdiocesan policies, hires and fires its own employees, pays the salaries and provides benefits for its employees, pays for the education of candidates for the priesthood, assigns priests to a particular parish or office, and makes decisions regarding major multi-million dollar projects – all without input from the Holy See. Reynolds Decl. ¶¶ 8-12, 14-21, 28. The Archbishop submits a report to the Holy See of the Archdiocese's activities every *five years*. Reynolds Decl. ¶ 36. Given the Archbishop and Archdiocese's activities and autonomy, the "Holy See does not exercise day-to-day control over the operations of the Archdiocese." Reynolds Decl. ¶ 35.

In particular, the Holy See did not exercise day-to-day control over what was the harm-producing activity here – the supervision of Miller, Wood and Kuntz. Courts require day-to-day control over the harm-producing activity to find employment. *Campbell*, 600 F.3d at 673; *Kelley v. S. Pac. Co.*, 419 U.S. 318, 327 (1974) (no employment where the putative employee was not being supervised by the putative employer "at the time of his injury"); *see also Papa John's*, 244 S.W.3d at 56 (requiring "control or right of control over the daily operation of the specific aspect of the . . . business that is alleged to have caused the harm"); *In re Air Crash at Lexington*, 2008 WL 2945944, at *5 (stating that the issue is "control or right of control over the alleged tortious conduct"); *Corbin Fruit Co. v. Decker*, 68 S.W.2d 434, 437 (Ky. App. 1934) ("The doctrine of the master's liability for the acts of the servant applies only where the master-servant relationship existed . . . in respect to the thing causing the injury."). As set forth above, the Archdiocese's documents unambiguously reveal that decisions with regard to the supervision and assignment of the priests at

issue were made by the Archbishop, not the Holy See.  *See supra* at 9-12.  In fact, in over 3,000 pages produced by the Archdiocese in the 2002-2003 litigation, there is not a single document revealing any Holy See control or involvement with the priests at issue.  The matters were handled locally, by the Archbishop and his delegates using their discretion and judgment.  *Metcalf & Eddy v. Mitchell*, 269 U.S. 514, 521 (1926) (exercising of "judgment and discretion" weighs against employee finding); *Kippen v. Jewkes*, 258 F.2d 869, 873 (10th Cir. 1958) (same).

In short, because the Holy See did not exercise day-to-day operational control over the Archbishop and the Archdiocese, the control element is not met.

### ii. Employment Cannot be Based Upon the Religious Control Allegations in the Complaint

In the absence of any facts showing the requisite day-to-day operational control, the Complaint relies on broad allegations of religious control.  In particular, the Complaint alleges that the Holy See "has absolute and unqualified power and control over . . . each and every bishop [and] archdiocese." Complaint ¶ 20; *see also*, *e.g.*, Cmplt. ¶¶ 42, 57, 94.[36]  Plaintiffs would have the Court adopt their interpretation of religious doctrine and theology to satisfy the control element of the employee status inquiry.[37]  However, under well-settled principles, such matters cannot be accorded weight in determining whether the Archbishop was the Holy See's employee.

As an initial matter, the Holy See's position is not that the employment inquiry itself is barred under First Amendment or common law principles that preclude the interpretation of religious doctrine.[38]  Instead, as the remainder of this brief makes clear, the Holy See urges the Court to

---

[36] Other allegations of religious doctrine, governance, canon law and polity are listed in the declaration of Dr. Peters.  *See* Second Declaration of Dr. Edward N. Peters in Supp. of Def. Holy See's Second Motion to Dismiss for Lack of Subject Matter Jurisdiction ("Peters Second Decl.") ¶ 18.

[37] It is true, as stated above, that the presumptive truthfulness of the Complaint's allegations has fallen away.  *See supra* at 4.  However, given the history of this case, the Holy See anticipates that Plaintiffs will continue to argue that the Holy See has "absolute and unqualified power and control" over bishops in claiming that the Archbishop was a Holy See employee.

[38] There are both constitutional and common law roots to the rule precluding judicial interpretation of religious doctrine.  *See*, *e.g.*, *Jones v. Wolf*, 443 U.S. 595, 603 n.3 (1979); *Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater*, 2 F.3d 1514, 1538 n.24 (11th Cir. 1993).

resolve the issue by resorting to civil law principles – such as whether the Holy See exercised day-to-day operational control, or whether other neutral employment factors are met (*see infra* at 35-40).

It is, instead, *Plaintiffs* who seek to introduce religious doctrine and theology into the Court's employment inquiry.  As Dr. Peters explains, the allegation that the Holy See has "absolute and unqualified power and control" is "inseparable from complex issues of theology, religious doctrine, and ecclesiastical governance; indeed, Plaintiffs' allegation purports to address in erroneously absolutist terms one of the most complex and sensitive issues in the life and history of the Church." Peters Second Decl. ¶ 19; *see also id.* ¶¶ 20-22.  Moreover, "as a matter of ecclesiastical history, the issue of the relationship between the Pope and the bishops – which involved questions of papal primacy and local autonomy – is extraordinarily complex."  Peters Second Decl. ¶ 23.  As Dr. Peters explains:

> Differing interpretations of these relationships can be traced back to the third and fourth centuries, and have been sources of continuing theological debates, some so profound as to result in events like the Great Schism of 1054. The issue was addressed, for example, in the Fourth Lateran Council of 1215, the Council of Florence in the fifteenth century, and the Council of Trent in the sixteenth century. More recently, Vatican I discussed the Roman Pontiff and the Petrine office, while Vatican II clarified doctrine regarding the College of Bishops.

Peters Second Decl. ¶ 22.  Given its theological underpinnings, and its rich and complicated history over nearly two millennia, any acceptance by the Court of Plaintiffs' characterization of the Holy See-bishop relationship would be unprecedented:

> [T]o address whether the Holy See exercises "absolute and unqualified control and power" over a bishop, a civil court would unquestionably be forced to wade deeply into Catholic religious doctrine, theology, and history. If a court were to find that the Holy See possessed such "absolute and unqualified" power over bishops, the court would, in effect, be re-defining a core doctrine of the Catholic Church – one marked by significant and overarching theological, religious, and historical ramifications. Explaining the relationship between the Pope and the bishops is extraordinarily complicated for even the best theologians, canonists, and historians. To my knowledge, no civil or canonical court has ever previously attempted to resolve this issue.

Peters Second Decl. ¶ 23.

As the remainder of the declaration demonstrates, Dr. Peters – relying on extensive canonical and theological authorities – profoundly disagrees with Plaintiffs' broad allegations regarding the Catholic Church's religious doctrine, governance, polity and canon law.  Peters Second Decl. ¶¶ 24-

60.[39]   As a result, if the Court were to examine the issue, it would be forced to resolve *disputes* regarding such sensitive religious and theological matters.[40]   This is, of course, exactly the type of inquiry that a civil court should not – indeed, cannot – undertake.  *See, e.g.*, *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 709 (1976) ("To permit civil courts to probe deeply enough into the allocation of power within a hierarchical church so as to decide . . . religious law (governing church polity) . . . would violate the First Amendment in much the same manner as civil determination of religious doctrine"); *Watson v. Jones*, 80 U.S. 679, 733-734 (1871) (discussing the "evils" that would result if civil courts were to inquire into "the doctrinal theology" and "the fundamental organization" of religious denominations); *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952) (stating that *Watson* permits religious organizations "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine."); *see also Hutchison v. Thomas*, 789 F.2d 392, 395 (6th Cir. 1986) ("[R]eligious controversies are not the proper subject of civil court inquiry."); *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 465 (D.C. Cir. 1996) (holding that it would be unconstitutional entanglement with religion for a court "to evaluate . . . competing opinions on religious subject").[41]

Plaintiffs' attempt to use broad characterizations of the Catholic Church's religious doctrine, structure of governance and polity to prove that the Holy See employs bishops would not only embroil the Court in a religious and theological dispute of historic proportions; it would also violate

---

[39] As Dr. Peters demonstrates, a resort to canon law and theology would yield the same result as the secular test, since the religious doctrine and theology of the Catholic Church squarely reject the notion that a bishop is an employee or agent of the Holy See.  *See, e.g.*, Peters Second Decl. ¶¶ 34-38.  However, as set forth in this section, the Court should not and cannot resolve the matter by interpreting the Catholic Church's central religious and theological tenets.

[40] This is true even as to what might appear to be fairly straightforward issues.  For example, while the Holy See appoints bishops (Cmplt. ¶ 32), the appointment is the final act of a collegial process involving, *inter alia*, sitting bishops in the United States.  Peters Second Decl. ¶¶ 55-56.  Similarly, while the Complaint alleges that the Holy See "removes" bishops (Cmplt. ¶ 37), the issue of removal concerns one of the most delicate matters in Church governance, and is the subject of disagreement among canonists and theologians.  Peters Second Decl. ¶¶ 57-58.

[41] The rule protects from both legislative and judicial intrusion.  *Kreshik v. St. Nicholas Cathedral*, 363 U.S. 190, 191 (1960).

the rule that civil liability cannot be based upon religious doctrine.  This is, in fact, why courts "have rejected uniformly claims for clergy malpractice."  *Sanders v. Casa View Baptist Church*, 134 F.3d 331, 337 (5th Cir. 1998); *cf. Arlinghaus v. Gallenstein*, 115 S.W.3d 351, 353 (Ky. App. 2003) (holding that "the relationship between parishioner and clergyman is essentially religious; its duties are not those of the civil law").  As the Eighth Circuit has stated, "[t]he doctrinal and disciplinary control exercised by the [national and state-wide church], or available for their exercise, is guided by religious conviction and religious law, not by employment relationships, and . . . should be considered impermissible or immaterial in determining the employment status of a religious minister."  *Alford v. United States*, 116 F.3d 334, 339 (8th Cir. 1997); *cf. Folwell v. Bernard*, 477 So.2d 1060, 1063 (Fla. App. 1985) ("The components of the ecclesiastical interrelationship between the parent church and the subordinate body cannot be permitted to serve as a bridge capable of reaching the non-secular parent in a civil proceeding.").

Instead of resolving disputes involving competing views of religious doctrine, theology and canon law, the Court should simply "focus on the actions of the parties involved."  *Tercero v. Roman Catholic Diocese of Norwich*, 48 P.3d 50, 59 (N.M. 2002); *see also, e.g., California v. Arizona*, 440 U.S. 59, 66 (1979) (recognizing "the long practice of the Court to forgo the resolution of constitutional issues except when absolutely necessary").  Here, that means examining whether the facts of the relationship between the Holy See and the Archbishop show that the Archbishop is a Holy See employee under the relevant employment factors.[42]

As set forth above, the applicable (and secular) control test examines whether the Holy See exercised day-to-day operational control over the Archbishop.  Given that that standard is clearly not met here, Plaintiffs have not met the control element of the common law inquiry.

---

[42] Since Plaintiffs are likely to continue to rely on religious doctrine, theology and canon law in arguing that the Archbishop was the Holy See's employee, the Court will need to be vigilant that Plaintiffs' evidence "is of a secular nature" and does not require the Court to resolve "religious controversies."  *Drevlow v. Lutheran Church*, 991 F.2d 468, 472 (8th Cir. 1993); *see also, e.g., Minker v. United Methodist Church*, 894 F.2d 1354, 1360 (D.C. Cir. 1990) (district court should "control the case so as to protect against any impermissible entanglements").

###### c.	The Holy See Does Not Pay the Archbishop's Compensation

Courts have held that "[c]ompensation by the putative employer to the putative employee in exchange for his services is not a sufficient condition, but it is an essential condition to the existence of an employer-employee relationship." *Graves v. Women's Prof'l Rodeo Ass'n*, 907 F.2d 71, 73 (8th Cir. 1990); *Bryson v. Middlefield Vol. Fire Dep't.*, No. 1:07CV724, 2009 WL 5030799, at *2 (N.D. Ohio Dec. 14, 2009) (same); *see also O'Connor v. Davis*, 126 F.3d 112, 115-16 (2d Cir. 1997) ("Where no financial benefit is obtained by the purported employee from the employer, no 'plausible' employment relationship of any sort can be said to exist . . . ."); *Eyerman v. Mary Kay Cosmetics, Inc.*, 967 F.2d 213, 218 (6th Cir. 1992) (no employee status where putative employer did not pay the salary of putative employee); *Crunk v. Dean Milk Co.*, No. 3:06CV-609-DW, 2008 WL 2473662, *5 (W.D. Ky. June 17, 2008) (same); *cf.* H.R. REP. NO. 245, at 18 (1947) (stating, in context of National Labor Relations Act, that "'employees' work for *wages or salaries* under direct supervision").

The Holy See did not and does not pay the Archbishop's salary.  Reynolds Decl. ¶ 31. Accordingly, this factor weighs heavily against a finding of employment.

###### d.	The Holy See Does Not Provide the Archbishop with Employee Benefits

"In virtually every case, a strong indication of a worker's employment status can be garnered through examining how the employer compensates the worker (including benefits provided) . . . ." *Hi-Tech Video Prods., Inc. v. Capital Cities/ABC, Inc.*, 58 F.3d 1093, 1097 (6th Cir. 1995); *see also*, *e.g.*, *Steilberg*, 275 S.W.3d at 736 (finding no employment status where putative employee did not receive insurance or retirement benefits); *Silviotti v. Morning Call, Inc.*, No. CIV.A. 01-4692, 2002 WL 31859429, at *6 (E.D. Penn. Dec. 12, 2002) (not receiving benefits "highly inconsistent with employee status").

The Holy See did not and does not provide the Archbishop with any employee benefits. Reynolds Decl. ¶ 32.  This factor weighs "very heavily" against employee status.  *Hi-Tech Video*, 58 F.3d at 1097.

### e.     The Archbishop is Not Treated as the Holy See's Employee for Tax Purposes

The failure to pay an individual's payroll or Social Security taxes, or withhold income tax, is "highly indicative" that the person is not an employee. *Farlow v. Wachovia Bank*, 259 F.3d 309, 315 (4th Cir. 2001); *see also Reid*, 490 U.S. at 752 (no employment status where entity "did not pay payroll or Social Security taxes"). In fact, with the exception of a case involving an hourly full-time warehouse worker subject to day-to-day control, "[e]very case since *Reid* that has applied the [common-law] test has found the hired party to be an independent contractor where the hiring party failed to extend benefits or pay social security taxes." *Lerohl v. Friends of Minn. Sinfonia*, 322 F.3d 486, 492 (8th Cir. 2003); *see also*, *e.g.*, *Hi-Tech Video*, 58 F.3d at 1097 (treatment of individual for tax purposes is "strong indication" in "virtually every case"); *Chambers v. Wooten's IGA Foodliner*, 436 S.W.2d 265, 266 (Ky. 1969).

The Holy See did not and does not pay the Archbishop's payroll taxes (Reynolds Decl. ¶ 33), a factor that is again "highly indicative" of the Archbishop's status as a non-employee.

### f.     The Holy See and the Archbishop of Louisville are Engaged in Distinct Occupations

Courts narrowly construe the distinct occupation factor. *See*, *e.g.*, *Lanigan Storage & Van Co. v. United States*, 389 F.2d 337, 342 (6th Cir. 1968) (loaders and unloaders of moving trucks held to be in "distinct occupation" from moving company). Relevant factors include whether the putative employee (a) is part of a separate corporation (*Kelley*, 419 U.S. at 327-28; *Brooks v. S.W. Transp. Co.*, 494 F.2d 1271, 1272 (6th Cir. 1974)); (b) is part of an organization with its own management structure (*In re Air Crash at Lexington*, 2008 WL 2945944, at *5); (c) hires and pays his own employees (*Reid*, 490 U.S. at 751-52; *Shah v. Deaconess Hosp.*, 355 F.3d 496, 500 (6th Cir. 2004));[43] (d) has separate bank accounts and records (*Frito-Lay, Inc. v. NLRB*, 385 F.2d 180, 185 (7th Cir. 1967); and (d) has separate insurance (*Wolcott*, 884 F.2d at 251).

The Archbishop is the sole member and legal representative of a separate corporation. The

---

[43] Where no prior approval is required to hire employees, this factor has "great probative value" and is "highly indicative" of status as a non-employee. *Aymes v. Bonelli*, 980 F.2d 857, 861 (2d Cir. 1992).

Archdiocese has its own management structure, hires and pays its employees, has its own bank accounts and files, and has its own insurance.  Reynolds Decl. ¶¶ 3, 5, 10, 14-15, 17-18, 25.  This factor weighs very heavily against employee status.

g.    **The Archbishop's Work Requires a High Degree of Skill**

Cases have a relatively low threshold for a showing of skill.  *See*, *e.g.*, *Lanigan Storage & Van Co.*, 389 F.2d at 341 (finding high degree in skill in loading and unloading furniture since it requires "perhaps several months of concentrated effort to obtain").

Because being an archbishop requires a high degree of skill in a number of different areas (Reynolds Decl. ¶ 30), this factor weighs strongly against employee status.

h.    **The Holy See Does Not Provide the Archbishop with Equipment or Instrumentalities for His Work**

The Holy See does not supply the Archbishop's equipment or instrumentalities of his work.  Reynolds Decl. ¶ 34. This factor weighs against a finding of employment.

i.    **The Archbishop Does Not Work on Holy See Premises**

The Archbishop does not work on premises or in facilities owned or operated by the Holy See (Reynolds Decl. ¶ 34), and the Holy See is located nearly 5,000 miles from Louisville, Kentucky.  *Cf. Reid*, 490 U.S. at 752 (no employment relationship where putative employee "worked in his own studio in Baltimore, making daily supervision of his activities from Washington practicably impossible").  This factor weighs against employment.

j.    **The Archbishop Decides When and How Long to Work**

Courts examine whether the putative employer controls the putative employee's schedule, including hours of work and vacation. *Weary v. Cochran*, 377 F.3d 522, 527 (6th Cir. 2004); *Steilberg*, 275 S.W.3d at 736.  The Holy See did not, and does not, dictate the hours or vacation of the Archbishop.  Reynolds Decl. ¶ 35.  This factor weighs against employment.

k.    **The Local Custom Weighs Against Employment**

The Archbishop has been the sole member and legal representative of the Archdiocese in Louisville since at least 1888.  Reynolds Decl., Exh. A.  The custom in the locality is for the Archbishop to do his work without supervision.  Reynolds Decl. ¶¶ 8-17, 19-29; *see also supra* at 9-12 (archdiocesan documents showing the Archbishop exercising discretion with regard to the

priests at issue).  This factor weighs heavily against employment.  *See* REST. 2D AGENCY § 220, cmt. i (stating that this factor, "together with the skill which is required in the occupation, is often of almost conclusive weight").

### l.  The Duration of the Archbishop's Tenure Weighs Against Employment

The duration of the relationship factor examines whether "employment" occurred over a "considerable period of time with regular hours."  REST. 2D AGENCY § 220, cmt. h.  As set forth *supra* at 25-27, 37, the Holy See did not "employ" the Archbishop to act on its behalf, and the Archbishop did not work for the Holy See with "regular" hours.

In addition, as set forth above, when an archbishop – like the late Archbishop Floersh, who served from 1924 to 1967 – serves in a position for decades without active supervision and with the equivalent of life tenure, it is a sign of *independence*, not employment.  *Cf.*, *e.g.*, *United States v. Hatter*, 532 U.S. 557, 568 (2001) (stating that the constitutional clause that secure federal judge's appointments "during good Behaviour – the practical equivalent of life tenure – helps to guarantee what Alexander Hamilton called the 'complete independence of the courts of justice'").

### m.  The Archbishop Hires and Pays His Own Employees

The Archbishop hires and pays his own employees.  Reynolds Decl. ¶¶ 17-19.  This factor weighs heavily against employment.  *See*, *e.g.*, *Wolcott*, 884 F.2d at 251; *Middleton v. Hacker*, No. 2006-CA-002364-MR, 2007 WL 3122270, at *2 (Ky. App. Oct. 26, 2007).[44]

### n.  The Running of the Archdiocese of Louisville is Not Part of the "Regular Business" of the Holy See

Courts interpret this factor narrowly.  *See Saiki v. United States*, 306 F.2d 642, 650 (8th Cir. 1962) (sexing of chicks not in regular business of suppliers of sexers to contracting hatcheries); *Metrop. Pilots Ass'n v. Schlosberg*, 151 F. Supp. 2d 511, 523-24 (D.N.J. 2001) (despite a "close relationship between the parties," supplying tugboats and tugboat captains is different from the business of piloting a ship into a dock).  The running of the Archdiocese is not part of the "regular

---

[44] Federal and Kentucky cases find the fact that the putative employee hires and pays a few assistants to be of high significance; in this case, the Archdiocese is the eighth-largest private employer in Jefferson County, with approximately *4,000* employees.  Reynolds Decl. ¶¶ 17-18.

business" of the Holy See.  *Cf.* Reynolds Decl. ¶¶ 27, 35.  Once again, this factor weighs against a finding of employment.

**o.      The Holy See is Not "In Business"**

The Holy See, a foreign sovereign of a religious nature, is not "in business."  *Cf. United States v. Lamont*, 330 F.3d 1249, 1254 (9th Cir. 2003) ("A church's primary function is essentially non-commercial and non-economic.").  This factor weighs against employment status.

**p.      The Holy See and the Archbishop Do Not Believe They Have an Employment Relationship**

The Archbishop and the Holy See plainly believe that there is no employment relationship between them.  First, as set forth above, for purposes of U.S. tax law, the Archbishop is not – and never has been – treated as a Holy See employee, demonstrating that neither the Archbishop nor the Holy See considers him to be an employee.  *See*, *e.g.*, *FedEx Home Delivery v. NLRB*, 563 F.3d 492, 499 n.4 (D.C. Cir. 2009) (noting that where the putative employer did "not provide benefits or withhold taxes[,] this goes to party intent."); *Aymes v. Bonelli*, 980 F.2d 857, 862 (2d Cir. 1992) (failure to extend employment benefits or pay payroll taxes "is highly indicative" that individual is not believed to be an employee); *see also* Reynolds Decl. ¶ 40 ("I do not believe that the Archbishop is the employee of the Holy See.   In addition, the Archbishop has never communicated to me, in any way, that he believes himself to be an employee of the Holy See.").

Second, under its own law, the Holy See does not consider diocesan bishops in the United States to be "employees" – a factor that the Sixth Circuit has identified as "highly indicative" of a finding of non-employment.  *Hi-Tech Video*, 58 F.3d at 1098; *see also Hilton Int'l Co. v. NLRB*, 690 F.2d 318, 321 (2d Cir. 1982) (relying on fact that individuals were not subject to the same personnel practices and disciplinary rules as regular employees to find non-employment).

The Holy See's employees are governed by detailed employment regulations reflecting staff levels, job descriptions, discipline, salaries and pensions.  None of the five successive regulations promulgated over the course of the twentieth century has treated diocesan bishops as either

employees or officials of the Roman Curia.[45]   Moreover, social security treaties, such as the *Convenzione di sicurezza sociale tra la Santa Sede e la Repubblica Italiana* (Jan. 1, 2004) (and its predecessors), do not include benefits for diocesan bishops.  Health regulations have never included diocesan bishops either.  *See, e.g., Fondo Assistenza Sanitaria Statuto e Regolamento* (Jan. 1, 1995) (Prot. N. 359.032/G.N.).  In short, as a matter of Holy See law, the ordination or installation of a bishop as pastor of a diocese in no way constitutes employment by the Roman Curia.  Niccolò Del Re, *LA CURIA ROMANA: LINEAMENTI STORICO-GIURIDICI* (4th ed. 1998), *passim*.

At bottom, the Holy See does not exercise the requisite day-to-day control over the Archbishop, and *all* of the remaining 14 factors weigh against employment.  In the run-of-the-mill case, a finding of employment under such circumstances would be unimaginable.  Here, the issue goes to the Court's subject-matter jurisdiction, the terms of the FSIA's exceptions to immunity must be narrowly construed, and Plaintiffs have the burden.  It is clear that this Court lacks subject matter jurisdiction over Plaintiffs' remaining claims.

## VII.   CONCLUSION

For the foregoing reasons, this Court should dismiss the Complaint for lack of subject matter jurisdiction.

---

[45]*See, e.g.*, *Regolamento Generale della Curia Romana*, Mar. 20, 1968, arts. 3-19, 42-47, 55-90, *in* 60 *AAS* 129-76 (1968) (setting forth employment rules for Holy See employees).  Lena Decl., Exhs. C and D.

Respectfully submitted,

LAW OFFICE OF JEFFREY S. LENA
Jeffrey S. Lena

_____/s/ Jeffrey S. Lena_____
1152 Keith Avenue
Berkeley, California 94708
(510) 665-1713


LAW OFFICE OF ALEXIS HALLER
Alexis Haller

_____/s/ Alexis Haller_____
1079 Euclid Avenue
Berkeley, California 94708
(510) 898-1210


LAW OFFICE OF BYRON H. DONE
Byron H. Done

_____/s/ Byron H. Done_____
1990 N. California Blvd., 8th Floor
Walnut Creek, CA 94597
(925) 932-7009


FULTZ, MADDOX, HOVIOUS & DICKENS PLC
R. Gregg Hovious
John David Dyche

_____/s/ R. Gregg Hovious_____
2700 National City Tower
101 S. Fifth Street
Louisville, Kentucky 40202
(502) 588-2000

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the foregoing was served in compliance with the ECF guidelines of this Court on May 17, 2010, upon: William F. McMurry, McMurry & Associates, 1211 Herr Lane, Suite 205, Louisville , KY 40222; and Douglas H. Morris and Lea A. Player, Morris & Player, PLLC, 1211 Herr Lane, Suite 205, Louisville , KY 40222.

_____/s/ Alexis Haller_____
Alexis Haller